## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

MARIO JACKSON (1)
BRANDON REDMOND (3)
DAYNA LIVERMAN (5)
ANTHONY RICHARDSON (6)

CRIMINAL ACTION NO.:
1:15-cr-00284-AT-JKL

## NON-FINAL REPORT AND RECOMMENDATION

This is a criminal action arising out of a series of alleged home invasions and kidnappings. This Non-Final Report and Recommendation addresses motions relating to Defendants Mario Jackson (1), Brandon Redmond (3), Dayna Liverman (5), and Anthony Richardson (6) that are ripe for resolution. I first address the following motions that Defendant Jackson filed:

1. Motion to Suppress Evidence Resulting from Unlawful Warrantless Seizure [Doc. 27]

2. Motion to Suppress Statements [Doc. 28]

3. Motion for Return of Seized Property [Doc. 29]

4. Motion to Dismiss Count Three in Light of *Johnson v. United States* [Doc. 30], adopted by Defendant Redmond [Doc. 108]

5. Preliminary Motion to Suppress Identification Testimony [Doc. 31]

6. Motion to Suppress Buccal Swab and Fruits Thereof Because the Search Warrant Lacked Probable Cause [Doc. 43]

7. Motion to Suppress Cellular Phone Search Warrant Because the Search Warrant Lacked Probable Cause [Doc. 44], adopted by Defendant Redmond [Doc. 213]

8. Motion to Suppress GPS Search Warrant Because the Search Warrant Lacked Probable Cause [Doc. 45], adopted by Defendant Redmond [Doc. 213]

9. Preliminary Motion to Suppress Pen Trap and Trace [Doc. 46], adopted by Defendant Redmond [Doc. 213]

10. Preliminary Motion to Set *Daubert* Hearing Regarding Reliability of CODIS DNA Match Evidence [Doc. 72]

11. Supplemental Motion to Dismiss 924(c) Counts (Three, Six, and Eight) in Light of *Johnson v. United States* [Doc. 109]

12. Supplemental Motion to Suppress Evidence from the Geo Location Warrant [Doc. 113], adopted by Defendant Redmond [Doc. 213]

13. Motion to Dismiss Counts Three, Six, Eight, Eleven and Thirteen in Light of *Johnson v. United States* [Doc. 210], adopted by Defendant Redmond [Doc. 213]

14. Perfected Motion to Suppress DNA Evidence and Request for *Daubert* Hearing [Doc. 211]

15. Jackson's Perfected Motion to Exclude Historical Cell Site Location Information and Request for *Daubert* Hearing [Doc. 252], adopted by Defendants Redmond, Richardson, and Liverman [Doc. 293, 294, 308]

16. Supplemental Motion in Limine to Preclude or Limit Testimony as to Mario Jackson's and Other Defendants' Locations Based Upon Cellular Tower Information and for *Daubert* Hearing Regarding Same [Doc. 264], adopted by Defendants Redmond, Richardson, and Liverman [Docs. 293, 295, 308]

Also pending before the Court is Defendant Redmond's Preliminary Motion to Suppress Statements [Doc. 97].

3

I.      **Mario Jackson's Motions**

A.      **Jackson's Motions to Suppress Evidence and Statements [Docs. 27 & 28.]**

Jackson has filed a motion to suppress evidence and statements that he made to law enforcement officers following a July 9, 2015 traffic stop.  The Court held an evidentiary hearing over three days – November 10, 2015, November 13, 2015, and March 17, 2016.[1]  Jackson filed a post-evidentiary hearing brief, [Doc. 132], the government responded, [Doc. 212], and Jackson filed a reply brief, [Doc. 236]. For the following reasons, I **RECOMMEND** that the motions be **DENIED**.

1.      **Relevant Facts**

On the evening of July 9, 2015, Georgia State Patrol officer Sergeant Stacy Collins observed a silver Nissan Altima driving on I-75/I-85 through Atlanta. [Doc. 80 at 9.]  Sgt. Collins was aware that some or all the occupants of the Altima were suspected of having been involved in home invasions.  [*Id.* at 27, 43.]  Sgt. Collins began to follow the Altima on the expressway and then continued to follow it as it exited onto Central Avenue in downtown Atlanta.  [*Id.* at 9, 19.]  From Sgt.

---

[1] The transcripts for each day are docketed at Doc. Nos. 80, 79, and 125, respectively.  I refer to particular pages of the transcripts by docket number and page number.

Collins's vantage point behind the Altima, he observed that the front seat passenger (Jackson) was not wearing a seat belt and that there was some movement in the back seat of the car.  [*Id.* at 10.]  At a red light, Sgt. Collins pulled up along the passenger side of the Altima and saw that the front seat passenger was not wearing a seat belt and that a small child was unrestrained in the back seat of the car.  [*Id.* at 10, 22.]  After the light turned green, the Altima proceeded forward, weaving to the left a bit, and drove onto the traffic lines.  [*Id*. at 10.]  At that point, around 10:15 p.m., Sgt. Collins activated the blue lights of his police car to pull the Altima over.  [*Id.* at 10, 22; government's Exhibit 1 ("GX 1") at 22:15.]  The ensuing traffic stop was recorded and is contained in a DVD, which was admitted as government's Exhibit 1 at the evidentiary hearing.

At around 10:17 p.m., the driver (Richardson) stopped the Altima in the rightmost lane of Central Avenue, adjacent to a sidewalk.  [GX 1 at 22:17.]  Sgt. Collins approached the driver's side of the car and told Richardson that he pulled Richardson over because a passenger was not wearing a seatbelt, Richardson had come out of his lane, and there was an unrestrained child in the back seat.  [Doc. 80 at 11, 33.]  Richardson told Sgt. Collins that the child was not his and that the child routinely got out of his car seat, but that he was not aware that the child had

done so.  [*Id.* at 11; GX 1 at 22:18.]  In the meantime, another officer approached the passenger side the car and stood on the sidewalk.  [GX 1 at 22:18.]

Richardson offered to step out of the car to show Sgt. Collins how the child was able to get out of the car seat.  [GX 1 at 22:18.]  Sgt. Collins responded that Richardson would have to get out anyhow and asked Richardson if he had a license. [*Id.*]  Richardson stated that he had a North Carolina license.  [GX 1 at 22:18.] Richardson then got out of the Altima and walked to the front of Sgt. Collins's police car.  [GX 1 at 22:19.]  Richardson identified himself as "Dexter Hinson" to Sgt. Collins and gave a false date of birth.  [Doc. 80 at 11; GX 1 at 22:20.] Richardson was unable to produce any identification.  [*Id.*]

At approximately 10:20 p.m., around three minutes into the stop, as Sgt. Collins was radioing in Richardson's false name and birth date, Jackson got out of the Altima, walked to the rear driver's side of the car, picked up the child and walked to the front of Sgt. Collins's police car where Richardson and Sgt. Collins were standing.  [Doc. 80 at 33; GX 1 at 22:20.]  Sgt. Collins had not ordered Jackson to stay in the Altima, nor had he told Jackson to exit the car.  [Doc. 80 at 34.]  Sgt. Collins asked Jackson if he had a valid license in case Richardson's was not valid and whether Jackson would be able to drive.  [GX 1 at 22:21.]  Jackson

6

responded that he could drive. [GX 1 at 22:21.] Sgt. Collins asked if he could look at Jackson's driver's license, and Jackson handed his license to Sgt. Collins. [GX 1 at 22:21.] Sgt. Collins also asked Jackson for Richardson's name, and Jackson responded that he knew Richardson only by a female name. [GX 1 at 22:22.] Sgt. Collins asked Richardson who owned the car, and he responded that it was his sister's. [GX 1 at 22:23.]

At 10:24 p.m., around seven minutes into the stop, Sgt. Collins asked Richardson and Jackson if they would mind if a police K-9 walked around the Altima. [GX 1 at 22:24.] Jackson responded the he did not mind because there were no drugs in the car. [*Id.*] The dog sniffed around the car and apparently did not indicate the presence of any contraband. [*Id.*]

At 10:26 p.m., Sgt. Collins instructed another officer to check Jackson's driver's license, as Jackson might need to drive. [GX 1 at 22:26.] Sgt. Collins then asked Richardson to take child back to the Altima to buckle the child into the car. [GX 1 at 22:26.] Richardson had difficulty buckling the child in, so Sgt. Collins instructed him to take the child out. [GX 1 at 22:27.]

Sgt. Collins ran the name "Dexter Hinson," which Richardson initially gave him, and it came back with no information. [Doc. 80 at 11.] Sgt. Collins also

checked the registration of the Altima, which indicated that the car was not registered to either Richardson or Jackson.  [Doc. 80 at 12.]

At approximately 10:28 p.m., Trooper Jonathan Nelms instructed Jackson to move from where he was standing in front of Sgt. Collins's car to the sidewalk, where Nelms was pointing.  [GX 1 at 22:28; *see* Doc. 79 at 6.]  At the evidentiary hearing, Trooper Nelms testified that he could not recall whether he told Jackson to step out of the roadway and back up on the curb, but that if he did, it would likely have been for Jackson's own safety.  [Doc. 79 at 6-8, 10-11.]  Around twenty seconds later, Sgt. Collins motioned for Jackson to join him at the rear side door of the Altima, where he was standing with Richardson and the child.  [GX 1 at 22:28.]  Jackson complied, and Sgt. Collins instructed Jackson to watch the child.  [GX 1 at 22:29.]  Sgt. Collins left Jackson alone with the child at the car and walked with Richardson back to the front of his police car.  [GX 1 at 22:29.]

At 10:29 p.m., around 12 minutes into the stop, Richardson identified himself as Anthony Richardson to Sgt. Collins, provided another date of birth, and stated that he had a North Carolina driver's license.  [GX 1 at 22:29.]  As Sgt. Collins was radioing in Richardson's information, the child got out of the rear driver's side of the car and began to run along the street toward Richardson.  [*Id.*

8

at 22:30.]  Jackson and an officer collected the child and attempted to put him back in the car.  [*Id.* at 22:31.]  Jackson stayed with the child in the car for approximately five minutes more, but since the child was crying, Jackson carried the child to Richardson to hold him.  [*Id.* at 22:35.]

Approximately 18 minutes into the stop, Sgt. Collins told Trooper Nelms that he was going to write a couple of citations and that they could either swap drivers or make an arrest.  [GX 1 at 22:35.]  At this point, Sgt. Collins was still waiting for information to verify the identity of Richardson.  [Doc. 80 at 36.]  Sgt. Collins testified at the evidentiary hearing that he believes that there was a delay of 25 to 30 minutes in ascertaining the true identity of Richardson because Richardson had given him a false name and date of birth and, once Richardson gave him his real name, it corresponded to a Georgia ID number rather than a driver's license.  [Doc. 80 at 38.]  Sgt. Collins also testified that Richardson had never been issued a driver's license, which further delayed verification of his identity.  [*Id.*]

One minute later, at 10:36 p.m., Trooper Nelms asked Jackson if he could look at Jackson's tattoos and take a picture of them.  [Doc. 79 at 9; GX 1 at 22:36.]  Jackson showed the tattoos to Trooper Nelms, but did not allow him to take any photographs.  [Doc. 79 at 9.]

9

At 10:39, approximately 22 minutes into the stop and as Sgt. Collins was writing citations to Richardson and Jackson, one of the officers said to another, "So, you don't mind taking him to jail, so we can impound the f--- out of the car?" [GX 1 at 10:39.] The other officer responded: "Yeah, that's fine."[2]  Around eight minutes later, at 10:47 p.m., one of the troopers stated to Sgt. Collins that "we are trying to stall a little bit because we think they threw something out when he was standing on the bridge. So one of our dogs is going to search." [GX 1 at 22:47.] Sgt. Collins responded that he still had a "good bit of paperwork to do." [*Id*.]

In the meantime, from 10:39 p.m. to 10:46 p.m., Jackson was engaged in conversation with a group of three to four officers on the sidewalk  At 10:46 p.m., Jackson walked back to the Altima, retrieved a mobile phone from inside, and brought to Richardson who was still standing in front of the police car, holding the child. [GX 1 at 22:46.] Jackson then returned to the sidewalk and resumed talking with the officers. [*Id*. at 22:46-57.] At 10:57 p.m., Sgt. Collins instructed a trooper to ask Jackson how much he weighs; the trooper told Sgt. Collins that Jackson weighs 235 pounds. [*Id*. at 22:57.] From 10:57 p.m. to around 11:02 p.m., Jackson

---

[2] At the evidentiary hearing, Sgt. Collins was unable to identify who made either statement. [Doc. 80 at 42.]

10

is seen speaking with Richardson and an off-camera trooper directly in front of Sgt. Collins's vehicle.  [*Id.* at 22:57-23:02.]

Then, at 11:02 p.m., approximately 44 minutes into the stop, Sgt. Collins returned Jackson's ID and issued him a citation for not wearing his seatbelt.  [GX 1 at 23:02; Doc 80 at 16, 36; Doc. 125 at 12.]  Jackson and Sgt. Collins then talked for around two minutes about the citation and Jackson's court date. [GX 1 at 23:02-04.]

While Sgt. Collins was issuing the citations, Atlanta Police Department Detective and FBI Task Force Officer Ari Bleifeld and Atlanta Police Department Investigator Daniel Worrell arrived at the scene.  At the time they arrived, Jackson was moving around.  [Doc. 80 at 67-68.]  He was not handcuffed or restricted to a particular place.  *Id.*  At 11:04 p.m., immediately after Jackson received his license and copy of the citation, TFO Bleifeld introduced himself to Jackson and they shook hands.  [Doc. 80 at 69.]  He began a conversation with Jackson, asking Jackson about biographical information and talking about the child.  TFO Bleifeld did not ask Jackson about firearms, criminal history, travel, or his whereabouts on certain days.  [*Id.* at 69.]  Jackson told TFO Bleifeld that he was interested in becoming a police informant, and they exchanged telephone numbers.  [*Id.* at 69-

11

70.]   During their conversation, which lasted for approximately 14 minutes, Jackson moved around the area.  [*Id.* at 72; GX 1 23:04-17.]

At 11:09 p.m. a trooper asked Richardson if "Peeples" was Richardson's sister who owned the Altima.   [GX 1 at 23:09.]   Richardson responded affirmatively.  [*Id.*]  At 11:13 p.m., Sgt. Collins told Richardson that he had to tow the Altima and asked Richardson if there were any valuables that he needed to retrieve from the car.  [*Id.* at 23:13-14.]

At 11:15 p.m., approximately 58 minutes into the stop, someone arrived at the scene to pick up the child in a separate car.  [Doc. 80 at 40; GX 1 at 23:15.] After the child had been placed into the car, Sgt. Collins asked Jackson if he had all his valuables from the Altima.  [GX 1 at 23:18; Doc. 80 at 17.]  Jackson initially claimed that a bag in the front passenger compartment of the car was his.  [Doc. 80 at 17.]  Sgt. Collins showed Jackson a backpack that he retrieved from the front passenger area, and Jackson responded that it was not his, and that a suitcase in the rear seat was his.  [Doc. 80 at 17; GX 1 at 23:19.]  Sgt. Collins then took the suitcase out of the car for him and asked Jackson if it contained any weapons.  [Doc. 80 at 17.]  Jackson indicated that there were no weapons.  Sgt. Collins asked if Jackson would mind if he looked in the bag before returning it to Jackson.  [Doc. 80 at 17-

18; GX 1 at 23:19.]  Jackson said he did not mind and that he would show Sgt. Collins that there were no weapons in the bag.  [Doc. 80. at 18; GX 1 at 23:19-20.] Jackson then opened up the suitcase in front of Sgt. Collins and showed the contents to Sgt. Collins and other officers standing nearby.  [Doc. 8- at 18; GX 1 at 23:20.]

At 11:20 p.m., after Sgt. Collins confirmed that the child had been picked up, he placed Richardson under arrest for driving without a license and driving with an unrestrained child.  [GX 1 23:20; Doc. 80 at 15; Govt. Exs. 3 & 4.]  Sgt. Collins then conducted an inventory search of the Altima and prepared the paperwork to impound the vehicle.  [Doc. 80 at 18.]  While Richardson was being arrested and Sgt. Collins conducted the inventory, Jackson walked along the sidewalk with his suitcase and spoke intermittently with TFO Bleifeld and another trooper.  [GX 1 at 23:20-25.]

Around four minutes into the inventory search, Sgt. Collins opened the backpack that had been on the front passenger side floorboard and discovered two handguns and two foot-long screwdrivers.  [Doc. 80 at 18; GX 1 at 23:24.]  At 11:26 p.m., all of the law enforcement officers present at the scene surrounded Jackson, and Sgt. Collins placed him under arrest.  [GX 1 at 23:26; Doc. 80 at 40.]

13

## 2.      The Parties' Arguments

Jackson moves to suppress all evidence and statements discovered during the July 9, 2015 traffic stop and all fruits thereof.  Jackson first argues that he was unlawfully seized because the officers unreasonably prolonged the duration of the traffic stop.  [Doc. 132 at 12-19.]  Relying on *Rodriguez v. United States*, 575 U.S. ___, 135 S. Ct. 1609 (2015), he contends that officers went beyond the time necessary to complete the mission of the traffic stop, which, according to Jackson, was limited to issuing him a ticket for not wearing a seat belt and possibly for having an unrestrained child in the rear seat of the vehicle.  [*Id.* at 14-15.] According to Jackson, the tasks associated with the traffic stop should have only included "ordinary inquiries incident to [the traffic] stop," including determining the license status of Richardson and Jackson, whether there were outstanding warrants out for Richardson's arrest, checking the insurance and registration status of the vehicle, ensuring that the child was properly restrained in a car seat, and issuing citations to Richardson and Jackson.  [*Id.* at 15-16.]  Instead, the officers "swarmed the scene," questioned Jackson about his tattoos and his weight, rifled through his luggage, refused to let him leave even after they issued him a citation, all without additional reasonable suspicion.  [*Id.* at 16.]

14

The government responds that the traffic stop lasted a reasonable amount of time because, during the stop, Richardson could not produce a driver's license and gave a false name and date of birth to the officers, both of which are illegal activity that justified prolonging the stop.  [Doc. 212 at 10.]  According to the government, the stop was prolonged for around an hour because Sgt. Collins had to verify Richardson's identity, he had to complete the paperwork for the arrest, and a member of Richardson's family came to pick up the child.  In short, the government argues that Richardson's illegal activity prolonged the stop, not law enforcement.  [*Id.* at 11.]

Jackson next argues that the statements he made during the traffic stop should be suppressed because he was not given *Miranda* warnings in advance of the questioning that resulted in those statements.  [Doc. 132 at 19-23.]  According to Jackson, at the time he made the statements to law enforcement, he was detained and not free to leave, and was therefore seized within the meaning of the Fourth Amendment.  [*Id.* at 20-21.]

The government responds that Jackson's statements were non-custodial; thus, law enforcement was not required to give *Miranda* warnings.  [Doc. 212 at 11-12.]  The government points out that none of the law enforcement officers

15

informed Defendant that he was under arrest until the firearms were discovered. The government further contends that, at the time Jackson made the statements, he was not handcuffed, he had not been placed into a patrol vehicle, his movement had not been restricted, and he was able to move about freely.  [*Id.* at 12.]

Finally, Jackson argues that the inevitable discovery exception is inapplicable under these circumstances.  [Doc. 132 at 23-25.]  The government does not respond to that argument, and does not affirmatively contend that the doctrine should apply here.

### 3.      Analysis of Suppression Issues

As detailed above, Jackson argues for the suppression of two categories of evidence: physical evidence discovered in the vehicle and statements made by Jackson to law enforcement.  [*See* Doc. 132 at 11.]  The potential suppression of each piece of evidence is governed by a distinct, but similar and often overlapping, analytical framework.  In that light, I find it helpful to lay out some of the framework before getting into the discussion of this case.

The suppression of the physical evidence is governed by the Fourth Amendment, which prohibits "unreasonable searches and seizures."  U.S. Const. Amend IV.  Generally speaking, any evidence that is obtained as a result of an

16

unreasonable (and therefore unconstitutional) search or seizure is not admissible as evidence in court. *Mapp v. Ohio*, 367 U.S. 643, 654-55 (1961).

The evidence of any statement made by Jackson may be suppressed under either the Fifth or the Fourth Amendment. The Fifth Amendment prevents the government from compelling a defendant to provide self-incriminating information. U.S. Const. Amend V. Under the Fifth Amendment and the decision in *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), the prosecution may not use statements made during a period of custodial interrogation unless police used "procedural safeguards effective to secure the privilege against self-incrimination." Even if otherwise voluntary for Fifth Amendment purposes, a statement may still be suppressed under the Fourth Amendment if the statement was the result of an unreasonable seizure. *See Dunaway v. New York*, 442 U.S. 200, 217-18 (1979); *see also Florida v. Royer*, 460 U.S. 491, 501 (1983) ("[S]tatements given during a period of illegal detention are inadmissible even though voluntarily given if they are the product of the illegal detention and not the result of an independent act of free will.").

*Dunaway* called the Fifth Amendment voluntariness inquiry a "threshold requirement" for the Fourth Amendment analysis. 442 U.S. at 217. Accordingly,

I will first analyze whether Jackson's statements should be suppressed under *Miranda* and the Fifth Amendment, and then discuss whether any evidence should be suppressed as the product of an unlawful search and seizure in violation of the Fourth Amendment.  For the reasons discussed herein, I find that Jackson was subjected to neither a custodial interrogation nor an unreasonable search and seizure.  Accordingly, Jackson's motion to suppress should be denied.

### a.  Whether Jackson was in custody when he made any incriminating statement such that *Miranda* warnings were required.

### i.  Standard

A person who is arrested and detained must be given full *Miranda* warnings in order for his statements, made in response to interrogation by a law enforcement officer, to be used against him in court.  *Miranda v. Arizona*, 384 U.S. 436 (1966). *Miranda* warnings are required, however, only when a defendant is interrogated while in custody.  *See J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011).

In determining whether a person is in custody, the court's first inquiry is whether, in light of the circumstances, a reasonable person would have felt free to leave.  *Howes v. Fields*, 132 S. Ct. 1181, 1189 (2012).  "The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant."  *United States v. Brown*, 441 F.3d

18

1330, 1347 (11th Cir. 2006). Further, "the reasonable person from whose perspective 'custody' is defined is a reasonable innocent person." *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir.1996). Neither the Defendant's subjective beliefs nor an officer's unarticulated plan to elicit information renders an encounter custodial. *United States v. Phillips*, 812 F.2d 1355, 1361-62 (11th Cir. 1987). The defendant bears the burden of proving custody and that his statements were made in response to questioning by law enforcement officials. *See United States v. Charles*, 738 F.2d 686, 692 (5th Cir. 1984), *rev'd on other grounds, United States v. Bengivenga*, 845 F.2d 593 (5th Cir. 1988) (en banc).

In making that determination, the Court must examine all of the circumstances surrounding the interrogation. Relevant factors include the location and duration of the questioning, statements made during the interview, whether physical restraints were used, and whether the subject was ultimately released after questioning. *Howes*, 132 S. Ct. at 1189. But not all restraints on an individual's freedom of movement constitute custody for purposes of *Miranda*. *Id.* Rather, the Court must determine "whether the relevant environment present[ed] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.* at 1190. "In making that determination, [the Eleventh Circuit has]

19

considered whether the circumstances were such that a reasonable person would have 'believe[d] that he was utterly at the mercy of the police, away from the protection of any public scrutiny, and had better confess or else.'" *United States v. Partin*, 634 F. App'x 740, 747 (11th Cir. 2015) (quoting *United States v. Acosta*, 363 F.3d 1141, 1150 (11th Cir. 2004)).

Other factors relevant in determining custody include "whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled." *United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006) (quotation omitted). In considering the totality of the circumstances, "[n]o particular fact in the 'custody' analysis is outcome determinative—[the court] simply weigh[s] the totality of the circumstances. *United States v. Brown*, 441 F.3d 1330, 1349 (11th Cir. 2006).

The Supreme Court has held that questioning during a traffic stop does not automatically constitute a custodial interrogation even though a driver who is pulled over by police would not feel free to leave the scene. *Berkemer v. McCarty*, 468 U.S. 420, 436-37 (1984). The *Berkemer* Court reasoned that two main characteristics of an "ordinary traffic stop" mitigated the danger—of a person feeling compelled to speak—that *Miranda* sought to remedy. *Id.* at 487-89.

Specifically: (1) detention pursuant to a traffic stop, as opposed to in the station house, is presumptively brief and the person being questioned expects that "he most likely will be able to continue on his way"; and (2) the circumstances associated with the "typical traffic stop," including that it is in public and is not "police dominated," is less likely to make a motorist feel "completely at the mercy of the police." *Id.* The *Berkemer* Court stopped short of holding that *Miranda* has no application in the roadside context, but rather held that a person is entitled to the "full panoply" of *Miranda* protections "as soon as a suspect's freedom of action is curtailed to a degree associated with a formal arrest." *Id.* at 440 (quotation omitted). The Supreme Court has recently reaffirmed that "the temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not constitute *Miranda* custody." *Maryland v. Shatzer*, 559 U.S. 98, 113 (2010) (citations omitted).

### ii.    Analysis

Jackson argues that he was in custody for the entirety of the traffic stop because a reasonable person in his circumstances would not have felt free to leave the scene. [*See* Doc. 132 at 20-21.] But, in light of the foregoing discussion of

21

*Berkemer*, he has misstated the standard that applies to the question of custody in the context of a traffic stop.

Under the *Berkemer* standard, I find that Jackson was not in custody during the traffic stop. To be sure, the traffic stop here was more "police dominated" than the "typical" one described in *Berkemer*, particularly with respect to the amount of officers present at the scene. Despite the number of officers present, the video of the incident makes clear that Jackson freely moved along the sidewalk. At no point before he was handcuffed and formally arrested did any officer draw a weapon, handcuff Jackson, use physical force, or verbally threaten him. Moreover, Jackson was not physically restrained or told to sit down, lie down, or sit in a police car; rather, he remained standing and free to walk around the entire time. He was left alone to sit with the child and from the video it appears that he was allowed to use his mobile phone. Though the stop occurred from around 10:00 p.m. to 11:00 p.m., the encounter was still in public as it occurred along a busy four-lane thoroughfare in downtown Atlanta, and even at that time of day, a steady stream of cars, trucks, and buses passed by the scene.[3]

_____

[3] Jackson states in his brief that he heard helicopters overhead. There is nothing to suggest that those helicopters had any connection with the stop at issue in this case.

Jackson points to just one instance during the traffic stop where Trooper Nelms instructed him to get out of the road and onto the sidewalk and stand in a particular place, which Trooper Nelms explained that was for Jackson's own safety. Moreover, Jackson remained in place for less than 30 seconds, until he was asked to help mind the child. Jackson did not return to the place that Trooper Nelms had instructed him to stand, and did Trooper Nelms did not direct him to return to a particular spot. Nothing about that encounter with Trooper Nelms would have made Jackson, or the objectively reasonable person, feel constrained in his movement beyond that which is normal in a traffic stop and certainly did not rise to the level of a formal arrest.

It is also true that the stop was relatively long, taking place over the course of more than an hour. But, *Miranda* guards against the police overbearing the will of a suspect, and so the length of the traffic stop is less relevant than the suspect's expectations about how long into the future the traffic stop will last at the time he made the statements in question. *See Berkemer*, 468 U.S. at 487-89. In that light, I should note that Jackson is less than clear in his argument as to which statements he seeks to suppress and he does not identify with any specificity when any particular statements were made. [*See* Docs. 132.] Even in his reply brief, which

23

argues that Jackson's "statement was made when he was surrounded by multiple armed, uniformed officers," he does not identify which statement he is referring to or when he made it. [*See* Doc. 236 at 7-8.]

Nevertheless, I find that Jackson was not in custody at any point before his formal arrest (and Jackson does not appear to argue that any statements were made after that point). While it was clear that this traffic stop would last longer than just a few minutes, nothing about the traffic stop would have communicated to Jackson that he would not be free to leave the scene at its conclusion. Before it was communicated to Jackson that the car would be towed, the reasonable person in Jackson's shoes likely would have been under the impression that he could drive the car from the stop. According to both my review of the record and Jackson's outline of the events, Jackson was not told that the car would be towed until around 11:15, roughly one hour into the stop. [*See* Doc. 132-2 at 10; GX 1 at 23:13-14.] Officer's questions about Jackson's weight, tattoos, and other identifying information all took place before Jackson was told that the car would be towed. [*See* Docs. 132-1; 132-2.] It is not clear that any questions or statements were made after that point.

24

Even after Jackson became aware that the car would be towed, he was not in custody for *Miranda* purposes. Jackson was not told that he was being investigated for anything other than the seatbelt violations, and he was not told that he faced imminent arrest. *See Phillips*, 812 F.2d at 1361-62 (any plan to the contrary is not relevant unless it was articulated to Jackson). While there were multiple police on the scene, Jackson was not restrained or forced into a particular place. Jackson was arrested only 10 minutes after he was told that the car would be towed. During those 10 minutes, police were going through the bags and items in the car. A reasonable and innocent person in Jackson's shoes (that is, someone unaware of the presence of firearms in the car) would not have had a reason to think that he would not be free to leave the scene once the car was processed. In short, while delayed, nothing changed Jackson's reasonable expectation that he would be on his way at some point in the near future.

Accordingly, considering the totality of the circumstances, I conclude that Jackson was not in custody during the traffic stop until his formal arrest. Thus any statement he gave before that point could not have been the result of an unlawful custodial interrogation.

### b.   Whether Jackson was unreasonably seized requiring the suppression of any evidence gathered as a result of that seizure.

### i.   Standard

A "seizure" under the Fourth Amendment occurs when police stop a vehicle, even for a brief period.  *See Whren v. United States*, 517 U.S. 806, 809-10 (1996). A traffic stop is constitutional if the officer had probable cause to believe a traffic violation has occurred, or if the traffic stop is justified by reasonable suspicion under *Terry v. Ohio*, 392 U.S. 1 (1968). *United States v. Harris*, 526 F.3d 1334, 1337 (11th Cir. 2008).  The stop may not last "any longer than necessary to process the traffic violation" unless there is articulable suspicion of other illegal activity. *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001); *see also United States v. Ramirez*, 476 F.3d 1231, 1236 (11th Cir. 2007).

"[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez*, 135 S. Ct. at 1614 (citing *Illinois v. Caballes*, 543 U.S. 405 (2005)).  An officer's "mission" includes "tasks tied to the traffic infraction," including determining whether to issue a ticket and making "ordinary inquiries incident to the traffic stop" such verifying identification, checking whether there are outstanding warrants, and

26

inspecting registration and insurance documents.  *Id.* at 1615; *United States v. Asghedom*, 646 F. App'x 830, 832-33 (11th Cir. 2016).  Such tasks serve the same objective as enforcement of the traffic code, namely, ensuring the safe and responsible operation of vehicles on the road.  *Rodriguez*, 135 S. Ct. at 1615.  And although an officer may conduct unrelated questioning during an otherwise lawful traffic stop, the inquiries are lawful only so long as they do not measurably extend the duration of the stop.  *Id.*  Nonetheless, an officer also may extend the duration of a stop for "further questioning beyond that related to the initial stop" if "he has an objectively reasonable and articulable suspicion [that] illegal activity has occurred or is occurring" or "if the initial detention has become a consensual encounter."  *United States v. Pruitt*, 174 F.3d 1215, 1220 (11th Cir. 1999) (citation omitted).

As part of a traffic stop, a law enforcement officer is permitted to order the occupants out of the car.  *Maryland v. Wilson*, 519 U.S. 408, 410 (1997); *Terrell v. Smith*, 668 F.3d 1244, 1252 (11th Cir. 2012).  The officer is also permitted to question the occupants, even if the questioning is unrelated to the reason for the stop, so long as the questioning does not prolong the stop.  *Arizona v. Johnson*, 555 U.S. 323, 333 (2009).

27

ii.    **Analysis**

As a threshold matter, there is no dispute that Sgt. Collins lawfully stopped the Altima, as he had probable cause to believe that there was an unrestrained child in the rear seat of the car and that the passenger (Jackson) was not wearing a seatbelt.  *See* O.C.G.A. §§ 40-8-76(b) (requiring restraint for children under the age of eight), 40-8-76.1(b) (requiring occupants in the front seat of a passenger vehicle to wear a safety belt).

What is in dispute, however, is whether the traffic stop was unreasonably prolonged.  I have carefully reviewed the video and transcripts in this case several times and I am persuaded that duration of the traffic stop here was not extended as a result of questioning outside the "mission" of the traffic stop.  At the beginning of the stop, Sgt. Collins asked Richardson for identification, which both Jackson and the government agree was appropriately within the scope of the "mission."  Richardson responded that he did not have a license while driving the Altima (which is a violation of Georgia law) and then provided a false name and date of birth to Sgt. Collins (another violation of Georgia law).  Richardson's lying to Sgt. Collins and complete lack of any identification or proof of authority to operate the Altima delayed issuing the citations because law enforcement had to spend time

28

verifying Richardson's identity.  In addition, Richardson's conduct gave Sgt. Collins an objectively reasonable and articulable suspicion of illegal activity that justified extending the duration of the stop to investigate further.  *See Pruitt*, 174 F.3d at 1220 (identifying factors that justify further questioning to include lack of proof of ownership of the vehicle, having no proof of authority to operate the vehicle, inconsistent statements about destination, driving with a suspended license, and reluctance to stop); *see also United States v. Aguilar*, 301 F. Supp. 2d 1263, 1271 (D.N.M. 2004) (holding that officer's extended detention of defendant at traffic stop was supported by a reasonable articulable suspicion of illegal activity because, *inter alia*, defendant was driving without a license, had no proof that he was the vehicle's owner, no proof of insurance, no registration, and no proof that he was otherwise authorized to operate the vehicle).

Moreover, from the time that Sgt. Collins pulled over the Altima to when Jackson was arrested, law enforcement officers were dealing with "tasks tied to the traffic infraction."  *See Rodriguez*, 135 S. Ct. at 1614.  At the evidentiary hearing, Sgt. Collins explained that it took 25 to 30 minutes just to verify Richardson's identity, then an additional 25 minutes to handle the paperwork for the citations, as he had to manually enter information since Jackson had a Tennessee driver's

license and Richardson a Georgia assigned ID number.  [*Id.*]  Moreover, since neither Richardson nor Jackson was a valid driver, a tow truck had to be called.[4] [Doc. 80 at 39.]

Relying on *Rodriguez*, Jackson argues that the K-9 sniff unreasonably prolonged the stop because there was no reason to walk a K-9 around the car for a mere seatbelt violation.  [Doc. 236 at 3-4.]  I disagree.  This case is distinguishable from *Rodriguez*, where the officer returned the occupants' documents to them and issued copies of traffic warnings, and then, after there was nothing else to do, conducted a nonconsensual dog sniff.  *See Rodriguez*, 135 S. Ct. at 1613.  Here, the dog sniff occurred around eight minutes into the stop, during the time when law enforcement was attempting to verify the false name and date of birth that Richardson had provided, and nearly six minutes before Richardson supplied his actual name and birth date.  Because the dog sniff occurred during the time that law enforcement was verifying Richardson's identification—a lawful part of the mission of the traffic stop—it could not, and did not, prolong the stop.  *See Purcell*,

---

[4] Sgt. Collins testified at the evidentiary hearing that he determined Jackson could not drive the Altima because he knew Richardson only by an alias, the vehicle was not registered to Jackson, and he did not carry any insurance.  [Doc. 80 at 37-38.]  He also explained that the protocol is to tow a vehicle if the driver is arrested and the other person neither owns the car nor knows the driver.  [*Id.* at 38.]

30

236 F.3d at 1278 (holding that "officer may prolong the detention to investigate the driver's license and the vehicle registration, and may do so by requesting a computer check").

Nor am I persuaded that asking Jackson for his weight and about his tattoos prolonged the stop. The Supreme Court has explained that "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009); *Purcell*, 236 F.3d at 1279–80. Those questions, like the dog sniff, occurred during the time period when Sgt. Collins was completing the paperwork for the citations, which is within the mission of the traffic stop. *See United States v. Sampson*, 388 F. App'x 950, 953 (11th Cir. 2010) (concluding that traffic stop not unreasonably prolonged where officer had not completed writing traffic citation).

Finally, Jackson argues that the officers should have completed the traffic stop sooner and points to statements that officers made in which they state that they were trying to stall. [Doc. 236 at 6.] Specifically, at 10:47 p.m., around thirty minutes into the stop, one officer stated that "we are trying to stall a little bit

31

because we think they threw something out when he was standing on the bridge. So one of our dogs is going to search." But viewing the record as a whole, I do not agree that the officers unreasonably delayed the stop. Almost immediately after being stopped, Richardson lied to about his identity and waited nearly 15 minutes to reveal his actual name and date of birth. In addition, Richardson possessed no identifying information; Jackson did not know Richardson's name; the Altima was not registered to either Jackson or Richardson; Richardson had no proof that he was an authorized driver; neither Jackson nor Richardson had a valid Georgia driver's license, which, according to Sgt. Collins, slowed the process down because he had to write citations manually; the child had to be supervised during the stop; someone had to be called to come and pick up the child; and the vehicle had to be inventoried before being impounded.

In sum, I conclude that although the stop lasted longer than a "routine" traffic stop, Sgt. Collins and the other law enforcement officers were engaged in constitutionally permitted conduct within the "mission" of the stop until Jackson's arrest. Accordingly, as there was no unreasonable seizure, neither the physical evidence nor any statements made during the traffic stop should be suppressed.

32

### B.     Jackson's Motion for Return of Seized Property [Doc. 29]

Jackson filed a motion to return the property seized during the July 9, 2015 traffic stop, including money, cell phones, and luggage.  [Doc. 29 at 1.]  Federal Rule of Criminal Procedure 41(g) allows for "[a] person aggrieved by an unlawful search and seizure of property or by the deprivation of property [to] move for the property's return."  In light of my recommendation that Jackson's Motions to Suppress Evidence and Statements relating to the traffic stop be denied, I **RECOMMEND** that Jackson's Motion for Return of Seized Property [Doc. 29] also be **DENIED**.

### C.     Jackson's Motion to Dismiss [30, 109, 210]

#### 1.     The parties' arguments

Jackson moves to dismiss the 18 U.S.C. § 924(c) counts of his indictment. [Doc. 30.]  Redmond adopted Jackson's motion.  [Docs. 33, 108, 213; docket entry dated Sep. 8, 2015.]  Jackson has filed a supplemental motion to reflect the second superseding indictment, moving to dismiss Counts Three, Six, Eight, Eleven, and Thirteen of the present indictment.  [Doc. 210.]

Jackson argues that Hobbs Act robbery, 18 U.S.C. § 1951(b), categorically fails to qualify as a "crime of violence" as a matter of law under the force clause of § 924(c).  [Doc. 210 at 1.]  In addition, Jackson argues that the residual clause of §

33

924(c) is unconstitutionally vague under the holding of *Johnson v. United States*, 576 U.S. __, 135 S. Ct. 2551 (2015).  [*Id.* at 1-2.]  As a result, Jackson argues, the § 924(c) counts must be dismissed because the Hobbs Act robberies cannot serve as proper predicate offenses.  [*Id.*]

Jackson incorporates by reference his earlier arguments in support of dismissal.  [Doc. 210.]  In the earlier brief, Jackson argues that Hobbs Act robbery fails the so-called "force clause" of § 924(c)(3) because it can be committed without the actual, attempted, or threatened use of force.  [Doc. 109 at 4.]  Because the force clause requires courts to look to the elements of the purported predicate offense, the categorical approach, from *Descamps v. United States*, 570 U.S. __, 133 S. Ct. 2276 (2013), applies.  [*Id.* at 5.]  Under the categorical approach, an offense can only serve as a predicate if all of the criminal conduct covered by the statute would qualify as a crime of violence.  [*Id.*]

Jackson argues that Hobbs Act robbery does not categorically satisfy the force clause because it can be accomplished through the threat of any future physical injury, and "physical injury" can be accomplished without the use of force or violent force.  [Doc. 109 at 5-6.]  Jackson reasons that non-forceful or violent conduct—such as threatening to poison someone—can result in physical injury or

even death, satisfying the Hobbs Act while simultaneously not satisfying the § 924(c) definition. [*Id.* at 6-9.] As a result, Jackson argues, Hobbs Act robbery cannot be considered a crime of violence. [*Id.* at 9.]

Jackson next argues that § 924(c)'s "residual clause" is unconstitutionally vague in light of *Johnson*, and, therefore, cannot support a finding that the Hobbs Act is a crime of violence under § 924(c)(3). [Doc. 109 at 9-10.] He argues that § 924(c)(3) suffers from the same shortcomings that led to the residual clause of the Armed Career Criminal Act ("ACCA") being declared unconstitutional in *Johnson.* [*Id.* at 10.]

The government responds that the Hobbs Act is a divisible statute, and, therefore, the modified categorical approach applies in determining whether it is a crime of violence. [Doc. 112 at 7.] Under *Descamps*, it argues, a statute is divisible if it explicitly lists alternative elements or means of commission. [*Id.*] The government contends that, based on the text of the Hobbs Act statute, there are six different ways in which the statute can be violated. [*Id.* at 8.] In the present case, the government asserts that the defendants were specifically charged with Hobbs Act robbery through the threatening of physical violence. [*Id.* at 8-9.] Accordingly,

the government argues that the charged portion of the offense is categorically a crime of violence and satisfies the force clause of § 924(c)(3).  [*Id.* at 9.]

The government next argues that, even taken in full, Hobbs Act robbery is a crime of violence under the "force clause."  [Doc. 112 at 10-15.]  The government argues that Jackson misinterprets *Johnson*'s definition of "physical force," because *Johnson* described "physical force" in reference to the force necessary to commit a robbery.  [*Id.* at 11.]  Accordingly, the government argues, it would make little sense to then hold that robbery can be committed with anything less than "physical force."  [*Id.*]

The government also argues that § 924(c)'s residual clause is constitutional, and *Johnson* did not hold otherwise.  [Doc. 112 at 15.]  It argues that the present procedural posture—prior to the trial being held on both the § 924(c) count and the underlying predicate offense—is different than the retrospective analysis of prior convictions at issue in *Johnson*.  [*Id.* at 16.]  In addition, the government argues, § 924(c) does not suffer from the same issues of vagueness that the ACCA statute at issue in *Johnson* had.  [*Id.* at 16- 24.]

36

### 2.  The pertinent statutes

In Counts Two, Five, Seven, Ten, and Twelve of the second superseding indictment, [Doc. 134], the government charged Jackson (all five counts), Defendant Scott (Count Five only), Liverman (Count Five only), Redmond (Counts Seven, Ten, and Twelve), Defendant Varner (Counts Seven and Ten), and Richardson (Count Twelve only) with Hobbs Act robbery.  In relevant part, the Hobbs Act reads:

> (a)  Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.
>
> (b)  As used in this section—
>
>> (1)  The term "robbery" means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining.

18 U.S.C. § 1951.

37

Using the Hobbs Act robbery charges as predicates, the Defendants were charged, in Counts Three, Six, Eight, Eleven, and Thirteen with using, carrying, or brandishing a firearm in relation to a crime of violence.  That statute reads, in relevant part:

> (c)(1)(A)    Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime—
>
> > (i)    be sentenced to a term of imprisonment of not less than 5 years;
> >
> > (ii)    if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and
> >
> > (iii)    if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.
>
> . . .
>
> (c)(3) For purposes of this subsection the term "crime of violence" means an offense that is a felony and—
>
> > (A)    has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
> >
> > (B)    that by its nature, involves a substantial risk that physical force against the person or property

38

of another may be used in the courts of committing
the offense.

18 U.S.C. § 924(c).

### 3. Background on the categorical and modified categorical approaches under the ACCA

In *Descamps*, the Supreme Court synthesized the framework used to evaluate whether a prior offense qualifies as a violent felony under the ACCA, 18 U.S.C. § 924(e). The categorical approach to making that determination requires that courts look to the elements of a prior offense in determining whether the offense is a crime of violence. *Descamps,* 133 S. Ct. at 2283. Even if a defendant used force in committing the prior offense, the conviction is not a proper ACCA predicate if forceful conduct was not required to violate the crime of conviction. *Id.* The Eleventh Circuit has held that the categorical approach also applies in determining whether a simultaneously charged offense can be a predicate offense for a § 924(c) conviction. *United States v. McGuire*, 706 F.3d 1333, 1336 (11th Cir. 2013). In *McGuire*, the Court explained that the categorical approach was employed because § 924(c), on its own terms, required that a predicate be an offense that "has as an element" the requisite actual, attempted, or threatened use of force. *Id.*

For a certain class of underlying offenses, a modified categorical approach applies. *Descamps*, 133 S. Ct. at 2283-84. The modified approach applies where

39

a statute has alternative elements, resulting in the defendant being charged and the jury being instructed only as to less than all of the alternatives.  *Id.* at 2284.  A statute that contains such alternative bases for a conviction is considered "divisible." Under the modified approach, the Court may look to a limited set of documents, including the charging paper and jury instructions, to determine which of the possible alternatives the defendant was convicted under.  *Id.* at 2283-84.  The modified approach only helps implement a categorical approach, allowing a court to discover which provision of a divisible statute was charged and convicted.  *Id.* at 2285.  It is not intended to aid a court in determining the underlying facts of a conviction.  *Id.* at 2284-85.  Accordingly, *Descamps* made clear that a court should not employ a modified approach to determine the factual conduct where the offense itself is not divisible.

### 4.   Analysis

After *Johnson* was decided, a number of defendants around the country have argued that the Hobbs Act is not a viable predicate for a § 924(c) offense.  My research reveals that the argument has been rejected by every court to have considered the issue.  Those courts have largely based their decisions on one of two theories: (1) the categorical approach does not apply to a pre-trial motion to dismiss

40

a § 924(c) charge; or (2) robbery, under the Hobbs Act, is categorically a crime of violence.  I am not convinced that the first rationale is entirely correct, particularly under Eleventh Circuit precedent.  But, I agree with every court to have considered the issue that Hobbs Act robbery is categorically a crime of violence.

> **a.   Even though the predicate offense is being considered by the same jury as the § 924(c) offense, the categorical and modified categorical approaches employed in ACCA cases apply.**

While neither party raises the issue in reference to the force clause, I find it appropriate to discuss the conclusion reached by several other courts that the categorical approach has no application in a pre-trial motion to dismiss a § 924(c) charge.  *Descamps*, citing to previous Supreme Court precedent, explained the three reasons for establishing an "elements-centric, formal categorical approach."  133 S. Ct. at 2287 (quotation omitted).  The reasons were: (1) the text and the history of the ACCA; (2) it avoids Sixth Amendment concerns that would arise from sentencing courts making findings of fact; and (3) it avoids the practical difficulties and potential unfairness of a factual approach.  *Id.*

The courts that have held that the categorical approach should not apply to a § 924(c) offense have focused on the fact that a jury can be properly instructed to find whether the facts of the case at hand meet the crime of violence definition.

41

*See, e.g., United States v. Monroe*, 158 F. Supp. 3d 385, 392-93 (W.D. Pa. 2016); *United States v. Morgan*, No. 14-20610, 2015 WL 9463975, at *3 (E.D. Mich. Dec. 18, 2015); *United States v. Church*, No. 1:15-cr-42-TLS, 2015 WL 7738032, at *6 (N.D. Ind. Dec. 1, 2015); *United States v. McDaniels*, 147 F. Supp. 3d 427, 431-33 (E.D. Va. Nov. 23, 2015).  I agree with those courts that a § 924(c) count, being adjudicated in the same trial as the predicate, does not give rise to the same Sixth Amendment and practical concerns involved in determining whether a prior conviction can serve as a § 924(e) predicate offense.  Nevertheless, given the text of § 924(c), I cannot find that the categorical approach has no application.

Under the "force clause," a crime of violence is one that "***has as an element***, the use, attempted use, or threatened use of physical force against the person or property of another."  18 U.S.C. § 924(c)(3)(A) (emphasis added).  Based on its language, therefore, § 924(c) applies only where the predicate offense elementally (that is, categorically) is a crime of violence.  If a defendant commits an offense that does not require, as an element, the actual, attempted, or threatened use of force, he cannot be convicted under § 924(c), even if he committed the underlying offense using obvious force.  As recognized by Justice O'Connor in *McGuire*, the nature of the categorical approach is that it looks to "the elements of the offense, and not

42

the actual facts of [] conduct." 706 F.3d at 1336. Accordingly, while I recognize the practical appeal of submitting the "crime of violence" question in its entirety to a jury, I find that a categorical approach must be applied because whether an offense can be a proper predicate is a question of law.

> **b.** **Even with the use of the modified categorical approach, it may still be appropriate to present part of the issue to the jury when applying § 924(c) simultaneous to the predicate offense.**

Concluding that the categorical and modified categorical approaches apply does not ignore the jury's role. A question can still be presented to a jury where: (a) a statute is divisible; (b) the divisible portions of the statute include both offenses that would be a crime of violence and that would not be a crime of violence; and (c) the indictment does not specify which alternative the defendant violated. In such a case, a judge may instruct a jury to specify which of the divisible portions of the predicate statute the defendant violated. If a unanimous jury decides the defendant violated a part of the statute that is categorically (as a matter of law) a "crime of violence," then it may also convict the defendant of a § 924(c) offense. This differs from the approach outlined in some of the above-cited cases. In my view, it is appropriate to ask a jury to determine which specific divisible unit of a statute the defendant ran afoul of, but not whether, factually, the defendant used

43

"physical force" in committing an offense.[5]  This approach recognizes the lack of a Sixth Amendment concern in the § 924(c) (as opposed to § 924(e)) context, while still giving meaning to the "has as an element" language of § 924(c)(3)(A).

### c.      The Hobbs Act is divisible.

Many of the courts to have considered this issue have concluded that the Hobbs Act is divisible into at least six separate offenses.  *See, e.g.*, *United States v. Lenzy*, 2:14-cr-25-RWS-JCF, 2016 WL 1019712, at \*3 (N.D. Ga. Feb. 4, 2016) (report and recommendation), *adopted as opinion of the court* 2016 WL 1047012 (N.D. Ga. Mar. 10, 2016).  Those six offenses are the taking of property:

> (1) by robbery; (2) by extortion; (3) by attempting to so rob or extort; (4) by conspiring to so rob or extort; (5) by committing physical violence to any person or property in furtherance of a plan or purpose to so rob or extort; or (6) by threatening to commit physical violence to any person or property in furtherance of a plan or purpose to so rob or extort.

*Id.*; *see* 18 U.S.C. § 1951(a).

---

[5] Therefore, I would find it inappropriate to submit the "crime of violence" question to a jury where the predicate statute is indivisible and not categorically a "crime of violence."  Even if the crime were committed with violent force, that force would not be "an element" of the underlying offense.

The first divisible unit of the statute—"robbery"—can be committed in up to four ways, listed in the statute in the disjunctive: (1) actual force or violence; (2) threatened force or violence; (3) immediate fear of injury; or (4) future fear of injury.  18 U.S.C. § 1951(b)(1).  Several courts have held that the divisions within the definition robbery are "means," and not separate elements, even though written in the disjunctive, because a jury does not need to agree on any one of them to convict a defendant.  *See, e.g.*, *United States v. Smith*, No. 2:11-cr-00058-JAD-CWH, 2016 WL 2901661, at *4 (D. Nev. May 18, 2016).

A recent ACCA case reaffirmed the necessity of the elements/means distinction.  *See Mathis v. United States*, 579 U.S. __, 136 S. Ct. 2243 (2016).  Interpreting the ACCA, the Court explained that the modified categorical approach only applies to alternative elements contained within a statute.  *Id.* at 2256.  If the alternative portions constitute means of violating the statute, then all of the possible means, taken together, constitute the categorical whole of the statute.  *Id.*

The elements/means distinction matters here because the operative indictment charges the various Hobbs Act offenses only through actual and

45

threatened force and violence. [*See* Doc. 134.][6] The indictment does not explicitly charge that any of the offenses were committed through placing the victims in immediate or future fear of injury, which is the subject of Defendants' categorical challenge. Accordingly, if the different methods of committing Hobbs Act robbery found in § 1951(b) represent separate elements, and therefore separate offenses, then the Defendants have not advanced any argument that the charged offense categorically fails to state a crime of violence. If they represent separate means, however, the government cannot make the offense a categorical crime of violence by eliminating a non-violent means from the charged offense.

The *Mathis* Court provided some guidance on how to make the elements/means distinction. Because the ACCA, § 924(e), often involves prior state offenses, the Court suggested first looking to the state law itself. *Mathis*, 136 S. Ct. at 2256. For example, in *Mathis*, a state court had specifically held that the

---

[6] The indictment tracks the language of § 1951(a), and the government suggests that it invokes only the fifth and sixth separate offenses cited from the *Lenzy* case above. However, the indictment as written would also allow for the possibility of a conviction for robbery, the first listed alternative offense, with the actual force or violence language being taken from the definition of robbery in § 1951(b). Because of that, I cannot treat the indictment as the government suggests, and I must consider whether Hobbs Act robbery is either further divisible or itself a categorical crime of violence.

jury need not agree on the type of structure that was the target of a burglary, and so the list of potential targets contained in the statute were means, and not elements. *Id.* The Court also stated that the statute itself might make the distinction clear, by providing for different punishments, or specifying what distinctions must be charged in an indictment. *See id.* The Court went on to say that, if the state law did not provide a clear answer, the record of conviction might. *Id.* at 2256-57. For example, if the indictment or jury instructions list all of the statutory alternatives, that is an indication that the different options represent means, and not elements. *Id.* at 2257. On the other hand, if the charging document or jury instructions contain only one of the statutory alternatives, that suggests that the statute contains a list of elements, each comprising a separate crime. *Id.*

At least one other Court has looked to the structure of the Hobbs Act itself to conclude that robbery and extortion are divisible elements of the Hobbs Act, but the ways in which a Hobbs Act robbery could be committed are indivisible means of committing robbery. *See United States v. Hancock*, 168 F. Supp. 3d 817, 820-21 (D. Md. 2016). Because the challenge to the § 924(c) count in *Hancock* was raised after the conviction, the Court's conclusion that the robbery definition listed means and not elements was based in large part on the fact that the indictment and

jury instructions in that case included those in the alternative.  *See id.* at 821.  If the indictment here, charging only violence, is determinative, that could suggest that the different types of Hobbs Act robbery are separate offenses.

The language of the Hobbs Act, however, suggests that the different types of Hobbs Act robbery are different means of committing the same offense.  Most notably, the language "by means of" precedes the list of types of Hobbs Act robbery in § 1951(b)(1).  That is not dispositive, as the drafters of the statute may not have had the same meaning of "means" in mind, but it is highly suggestive.  The different types of robbery are also listed within the same subsection of the Hobbs Act, while robbery and extortion are defined in separate subsections.  18 U.S.C. § 1951(a).  I need not make a definitive determination on this issue, however, as I, for reasons discussed below, conclude that Hobbs Act robbery in its broadest sense is categorically a crime of violence.

### d.      Hobbs Act robbery is a crime of violence.

The Defendants do not point to, and my research does not reveal, any case in which a court has held that Hobbs Act robbery is not a crime of violence under the force clause of § 924(c).  The thrust of Defendants' argument is based on courts interpreting other predicate offenses with an injury requirement that held that injury

does not necessarily need to be occasioned by violent force.  [*See* Doc. 30 at 4-9.] Therefore, Defendants argue, the offense of Hobbs Act robbery can be committed in a way that would not satisfy the force clause, and therefore is not a categorical crime of violence.

Despite Defendants' well-taken arguments, every court to have considered the issue appears to have held that Hobbs Act robbery, categorically, is a crime of violence under the force clause.   The Eleventh Circuit, in non-binding, but persuasive authority, has said so on more than one occasion.  *See In re Colon*, 826 F.3d 1301, 1305 (11th Cir. 2016) (holding that Hobbs Act robbery "clearly qualifies" as a crime of violence under the force clause); *In re Saint Fleur*, 824 F. 3d 1337, 1340 (11th Cir. 2016) (same);[7] *see also United States v. Langston*, 662 F. App'x 787, 794 (11th Cir. 2016) (same, on direct appeal, but unpublished and applying plain error review).

---

[7] Even though the Circuit's conclusion that Hobbs Act robbery was a crime violence served as the basis for its conclusion in these two published cases, I do not consider it binding authority because the *Saint Fleur* and *Colon* cases involved an application for leave to file a successive 28 U.S.C. § 2255 motion under § 2255(h), which has a different standard than the issue before me.   Nevertheless, the unequivocal nature of the Circuit Court's pronouncement is highly persuasive.

On a direct appeal, the Second Circuit has held that Hobbs Act robbery satisfies § 924(c)'s force clause, and, therefore, was a crime of violence. *United States v. Hill*, 832 F.3d 135, 142-44 (2d Cir. 2016). The Second Circuit addressed essentially the same arguments that Defendants have raised here and held that (1) there is no realistic probability that threatening to poison a victim would be covered by the Hobbs Act, and (2) such conduct would constitute physical force, even if the force was applied indirectly through the poison. *Id.*

A California District Court has recently recognized that, even though the Ninth Circuit has held that conspiracy to commit Hobbs Act robbery does not meet § 924(c)'s force clause, that Circuit has held that the substantive robbery offense "indisputably" meets the force clause. *United States v. Luong*, Cr. No. 2:99-00433-WBS, 2016 WL 1588495, at *2 (E.D. Cal. Apr. 20, 2016), *appeal docketed*, No. 16-10220 (9th Cir. May 24, 2016). Numerous other courts, including this one, have also held that Hobbs Act robbery is categorically a crime of violence. *See, e.g.*, *United States v. Tyree*, No. 3:16CR00022, 2016 WL 7441715 (W.D. Va. Dec. 23, 2016); *United States v. Philpot*, No. 1:15-cr-28-WSD, 2016 WL 7404440 (N.D. Ga. Dec. 22, 2016); *United States v. Munoz*, No. 12-CR-31, 2016 WL 6561405 (S.D.N.Y. Oct. 28, 2016).

50

While I do not believe there is direct, binding authority on point, an overwhelming amount of persuasive authority has held that Hobbs Act robbery is a categorical crime of violence under the force clause of § 924(c). I see no reason to depart from the unanimity of courts, including other Judges of this Court and the Eleventh Circuit, on that issue. I, therefore, need not consider whether the residual clause of § 924(c) is unconstitutionally vague, and I **RECOMMEND** that the motion to dismiss be **DENIED**.

### D.   Jackson's Preliminary Motion to Suppress Identification Testimony [Doc. 31]

Jackson moves to suppress any identification testimony as a prophylactic measure because, at the time, Jackson had not been advised of any identification testimony. [Doc. 31.] The government represented that it did not intend to introduce any identification testimony as to Jackson. Accordingly, I **RECOMMEND** that this motion be **DENIED**.

### E.   Jackson's Motion to Suppress Buccal Swab Evidence [Doc. 43]

#### 1.   The parties' arguments

Jackson argues that the Court should suppress the DNA buccal swab taken from him, and all fruits thereof, because the search warrant that authorized the swab was not supported by probable cause. [Doc. 43 at 1.] The affidavit submitted in

support of the search warrant stated that the agent sought the swab for testing relating to a hat found at the scene of a robbery on January 31, 2015.  [*Id.* at 2.] Jackson argues, however, that the affidavit failed to establish probable cause that he was involved in the January 31 crime.  [*Id.*]  The affidavit's statement that Jackson was under indictment for a May 25 offense did not establish probable cause for the January 31 offense.  [*Id.* at 3.]  Jackson further argues that the affidavit's conclusory allegations that an unknown informant—who told police that Jackson had committed multiple home invasions—was reliable should not have added much to the probable cause inquiry.  [*Id.* at 3-4.]  He argues that the holding in *Maryland v. King*, 569 U.S. ___, 133 S. Ct. 1958 (2013), allows for DNA swabs with less than probable cause only where the swab is taken for a non-investigative purpose.  [*Id.* at 5-6.]  Here, the swabs were clearly investigative in nature, and therefore probable cause was required before they could be authorized.  [*Id.* at 6-7.]

The government responds that the affidavit was supported by probable cause because it outlined evidence that Jackson was found to possess guns stolen from robberies committed in a similar fashion to the one being investigated.  [Doc. 120 at 3.]  Even if the warrant were not supported by probable cause, the government

asserts that the resulting evidence should not be excluded, because the officers obtaining the evidence acted in good-faith reliance upon the search warrant. [*Id.* at 3-4.] None of the circumstances that would invalidate the good-faith exception are present here. [*Id.* at 4-5.]

### 2.      The warrant and affidavit

The warrant at issue (case number 1:15-mc-908) authorized a search of Jackson's person, already in custody as a pre-trial detainee, to obtain "DNA to be sampled by buccal swabs of Mario Deandre Jackson's cheeks." [Doc. 120-1 at 1.] The affidavit supporting the warrant was sworn to by FBI Special Agent Timothy J. Burke. [*Id.* at 3.] The affidavit first described a January 31, 2015 robbery, committed at 9:15 p.m., in which a male armed with a small hand gun entered a private residence, held the residents at gun point, demanded cash and jewelry, and forced the residents to drive him to a Wells Fargo ATM at 3330 Northside Parkway in Atlanta. [*Id.* at 4.] The victims of that robbery described the robber as a black male, approximately 6'2" and 220 pounds wearing all black, including a ski mask. [*Id.*] Police later found a black hat left by the robber in the victims' car, and the police gave the hat to the GBI to search for DNA. [*Id.*]

Burke's affidavit next described a May 25, 2015 robbery, committed at 9:15 p.m., in which robbers entered the home, held a family including children at gunpoint, and collected jewelry, clothing, and cash. [Doc. 120-1 at 5.] During the robbery, one of the robbers took an adult male victim and forced him to drive to the Wells Fargo ATM at 3330 Northside Parkway in Atlanta. [*Id.*] Witnesses described the robber who went to the Wells Fargo as a black male, approximately 6'3", and wearing all black. [*Id.*]

Burke further stated that, on July 9, 2015, Jackson was found after a traffic stop to be in possession of two stolen handguns that had been stolen during home invasions—one in Memphis and one in June 2015 in Atlanta—"similar to the ones" previously described in the affidavit. [Doc. 120-1 at 5.] Prior to the instant warrant, Jackson was indicted for the May 25 robbery. [*Id.* at 5-6.] Burke sought the buccal swab in this warrant because "probable cause exists to believe that Jackson may be the robber in the January 31, 2015 robbery." [*Id.* at 6.]

### 3.    Standards governing review of an issued warrant

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. Amend. IV. In reviewing the legitimacy of a search warrant, the reviewing court should not

interpret the supporting affidavit in a hypertechnical manner, but rather should engage in a realistic and commonsense approach, giving a high level of deference to the magistrate who made the initial probable cause determination. *United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994) (citing *Illinois v. Gates*, 462 U.S. 213, 236-37 (1983)).   In making the initial probable cause determination, the issuing magistrate should make a "practical, commonsense" determination whether the circumstances set forth in the affidavit give rise to a "fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* (quotation omitted).   In sum, a court should not disturb the issuance of a search warrant unless it determines that the issuing magistrate did not have a substantial basis for concluding that the search would uncover evidence of wrongdoing. *Gates*, 462 U.S. at 236.

### 4.    The affidavit provided probable cause for the buccal swab warrant.

Burke's affidavit gave the issuing magistrate judge here a substantial basis to conclude that a swab for Jackson's DNA had a fair probability of resulting in evidence of a crime.   The affidavit laid out that two home-invasion robberies—one in January and one in May—were carried out in Atlanta.   In both robberies, a suspect with a similar (albeit general) description broke into a home with a gun and

55

accompanied one or more victims to *the same* ATM. Under a practical, commonsense approach, there was a fair probability that the offenses committed by the same person.

At the time of the warrant's issuance, Jackson was under indictment for the May robbery. The fact of the indictment established probable cause of Jackson's involvement in the May crime. *See Kaley v. United States*, 571 U.S. ___, ___, 134 S. Ct. 1090, 1097-98 (2014) (holding, in a different context, that a properly issued indictment "conclusively determines the existence of probable cause to believe the defendant perpetrated the offense alleged" (quotation omitted) and that the grand jury's finding is applicable in contexts other than merely the commencement of the criminal proceeding). The robber in the January robbery left behind a hat that could contain DNA evidence.

In sum: (1) there was probable cause that the same person committed the January and May robberies; (2) there was probable cause that Jackson committed the May robbery; and (3) there was probable cause that the person who committed the January robbery left DNA evidence at the scene. Therefore, there was a fair probability that the DNA swab of Jackson would provide evidence relevant to the January robbery.

Accordingly, I **RECOMMEND** that Jackson's Motion to Suppress the Buccal Swab Evidence [Doc. 43] be **DENIED**.

### F.   Jackson's Motion to Suppress Cellular Phone Search Warrant [Doc. 44]

#### 1.   The parties' arguments

Jackson argues that the warrant for the search of cellular phone failed to establish probable cause and was overbroad.  [Doc. 44 at 1-2.]  The warrant was overbroad, he argues, in that it authorized the search of every application and file on the phone, making the warrant an impermissible "general warrant."  [*Id.* at 2.] Further, Jackson argues that the affidavit supporting the warrant failed to provide particularized facts that would have linked the phone found on Jackson when he was arrested to any criminal activity.  [*Id.* at 4.]  There was nothing in the affidavit showing the source of information to be reliable, and even if reliable, the information did not provide a substantial basis to determine that probable cause existed.  [*Id.* at 5.]

The government responds that probable cause existed for the warrant because the phone that was in Jackson's possession when he was arrested had used cell towers near and at the time of two of the alleged robberies.  [Doc. 121 at 2-3.] Even if not supported by probable cause, the good-faith exception applies and none

of the circumstances that would invalidate its application are present here. [*Id.* at 3-5.]

### 2.    The warrant and affidavit

The warrant in question (case number 1:15-mc-797) authorized the search and seizure of "certain information and certain data" found on a "Black Samsung Galaxy Express Cellular Telephone Recovered from the Person of Mario Deandre Jackson on July 9, 2015 in Atlanta, Georgia." [Doc. 121-1 at 1.] The information to be seized was listed in a separate attachment. [*Id.* at 3-5.] Broken up into several categories, the warrant essentially authorized the seizure of any information contained within the phone that pertained to a robbery, the possession of firearms, or to the identity of the people involved in any crime. [*See id.*]

FBI Task Force Officer Ari Bleifeld swore via affidavit that he was investigating Jackson and Scott's involvement in robberies. [Doc. 121-1 at 1.] During the May robbery, the robbers stole jewelry including a wedding ring, currency, Jimmy Choo shoes, and Prada handbags. [*Id.* at 3.] The robbers also recorded the victim's cell phone number, and, around 2 a.m. following the robbery, the victim received a phone call from (901) 602-1788 ("the 1788 phone"). [*Id.*]

In late May, investigators received an anonymous tip claiming that two individuals had returned from travel to Atlanta with Jimmy Choo shoes, Prada handbags, and a wedding band. [Doc. 121-1 at 3.] News reports of the robberies had not included brand names. [*Id.*] The tipster identified one of the individuals as Leon Scott, and provided the phone number of (901) 801-9832 ("the 9832 phone"). [*Id.* at 3-4.] Records confirmed that Scott was associated with the 9832 phone. [*Id.* at 4.] Analysis of the toll records for the 1788 phone revealed that the 9832 phone was the second most frequent contact. [*Id.*] During the time that the May robbery victim was being forced to use an ATM, the 1788 phone utilized the segment of a cell tower that covers the area of the ATM to receive a phone call from the 9832 phone. [*Id.*] Two other outgoing calls from the 1788 phone made during the timeframe of the robbery used the segment of a cell tower that covered the victims' residence. [*Id.*]

Per the service provider, the 1788 phone was cancelled on May 26, 2015, shortly after the robbery. [Doc. 121-1 at 5.] Analysis of records revealed that the user of the 1788 phone "migrated" to (901) 500-9328 ("the 9328 phone"). [*Id.*] During a June robbery in Stone Mountain, Georgia, the 9328 phone made use of cell towers that service the geographical area of the robbery. [*Id.*] Less than a

week later, during a robbery in Roswell, Georgia, the 9328 phone utilized cell towers servicing that geographical area.  [*Id.*]

Based on a GPS search warrant issued for the 9328 phone in July 2015, police determined that Jackson possessed the handset for the 9328 phone.  [*Id.* at 6-7.]  Jackson was subject to a traffic stop on July 9, where he was discovered to illegally be in possession of guns.  [*Id.* at 7.]  During the stop, he asked Bleifeld about becoming a confidential source, and offered to call Bleifeld from his "main" cell phone number, giving the 9328 phone number.  [*Id.* at 7-8.]  The physical telephone that is the subject of the warrant was on Jackson when he was arrested. [*Id.* at 8.]

### 3.  Additional law governing overbroad warrants.

The same standards discussed in reference to the previous motion apply here. In addition, a warrant must describe, with particularity, the target of the search, or it is unconstitutionally overbroad.  U.S. Const. Amend. IV; *United States v. Travers*, 233 F.3d 1327, 1329 (11th Cir. 2000).  The particularity requirement is intended to protect against "general, exploratory rummaging" and decrease the risk of excessive intrusion into constitutionally protected areas.  *United States v. Wuagneux*, 683 F.2d 1343, 1348-49 (11th Cir. 1982) (quotation omitted).  "A

60

description is sufficiently particular when it enables the searcher to reasonable ascertain and identify the things authorized to be seized." *Id.* at 1348.

### 4. The affidavit provided probable cause for the search of the target telephone and seizure of information found on the phone, and the warrant itself was sufficiently particularized.

I find that probable cause supported the issuing of the warrant in question. The affidavit established that the target phone was on Jackson's person when he was arrested and that Jackson offered the 9328 phone number as his "main" phone. It also established that the 9328 phone was likely used by the same person who used the 1788 number, and Jackson does not make a sufficiently persuasive argument that the magistrate judge was not entitled to rely on the officer's representation on that point. Further, the affidavit established that the 9328 and 1788 phones were used in the area of known robberies, and the 1788 phone was in frequent contact with Scott's 9832 phone, including during and in the vicinity of the May robbery. In sum, the affidavit established probable cause to believe that the owner of the 9328 phone was involved in several robberies, and that the owner used his phone to communicate with other robbers during at least one robbery. Accordingly, I find that there was probable cause to believe that evidence concerning the robberies and the people involved in the robberies would be found on Jackson's phone.

61

As to the particularity requirement, this Court dealt with a similar warrant in *United States v. Pineda*, 1:11-cr-6-CAP-JFK, 2012 WL 2906758, *20 (N.D. Ga. Jun. 4, 2012) (King, M.J.). I agree with Judge King's reasoning in *Pineda* and find that the same applies here. While allowing for the search of, in essence, the entirety of the subject telephone, the search was limited to the phone (as opposed to all of Jackson's belongings), and the seizure was limited to files containing evidence of specific crimes or the people who were involved in those crimes. I find that the warrant was sufficiently particularized to minimize the intrusion into Jackson's protected interests while allowing for effective investigation.

Accordingly, I **RECOMMEND** that Jackson's Motion to Suppress Cellular Phone Search Warrant [Doc. 44] be **DENIED**.

## G. Jackson's Motion to Suppress GPS Search Warrant [Doc. 45]

### 1. The parties' arguments

Jackson argues that the warrant in question was facially invalid, as it only identified a phone number and a mobile service carrier, but failed to describe the phone's owner, location, or appearance. [Doc. 45 at 2.] Similarly, he argues, the underlying affidavit failed to describe the phone with any particularity. [*Id.* at 2-3.] Nothing in the warrant addresses the telephone assigned to the target number.

62

[*Id.* at 4.]   The failure to link the target number to any criminal activity (or to mention the number at all) demonstrates the lack of probable cause.  [*Id.*]  Jackson contends that any evidence obtained as a result of the GPS warrant, including the seizure of his cell phone and the search thereof, should be suppressed as fruit of the poisonous tree.  [*Id.* at 4-5.]

Jackson supplements his motion based on new evidence to add an argument under *Franks v. Delaware*, 438 U.S. 154 (1978).  [Doc. 113.]  Per the affidavit supporting the GPS warrant, a cellular telephone ending in 1788 called an alleged victim at a particular time.  [*Id.* at 2.]  The call records for that phone, however, show an outgoing phone call around that time only to a Miami, and not Atlanta area, phone number, and there is no reason to believe that number belonged to the victim.  [*Id.*]  In the warrant affidavit, the police indicated that the received the records of the 1788 number and confirmed that the call was in the records.  [*Id.* at 3.]  Further, the cell site records show, contrary to the affidavit, that the subject phone was many miles from the crime.  [*Id.* at 3.]  Jackson requests the opportunity to supplement his brief after he has consulted an expert on cellular phone records. [*Id.*]

The government responds that the warrant was supported by probable cause because the affidavit outlined that a phone number used in a robbery was cancelled the day after the robbery and the information migrated over to a new phone number—the target of the warrant.  [Doc. 122 at 1-3.]  Even if not supported by probable cause, the good-faith exception applies, and none of the circumstances that would invalidate the exception is present here.  [*Id.* at 4-5.]  The police acted in an objectively reasonable manner in relying on the warrant.  [*Id.* at 5-6.]  The government also argues that Jackson cannot meet his burden to establish a *Franks* violation because Jackson has not shown that the affiant did not believe in the truth of the information he provided in the affidavit.  [*Id.* at 7-9.]

## 2.      The warrant and affidavit

The warrant in question (case number 1:15-mc-754) authorized the search of geo-location data, including GPS data, for the 9328 phone.  [Doc. 122-1 at 1.]  The affidavit supporting this warrant was substantially the same as the warrant discussed in the previous section, with the obvious exception of not containing any of the information that was obtained as a result of the instant GPS warrant.  [*See id.* at 4-10.]

### 3.     Law governing a *Franks* challenge to the warrant

The Supreme Court has held that a defendant is entitled to a hearing where he "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Franks*, 438 U.S. at 155-56.  In order to obtain a hearing, a defendant's allegation of knowing or reckless falsehood must be accompanied by an offer of proof, including affidavits or other reliable statements, or a satisfactory explanation for the absence of such proof.  *Id.* at 171.

Under *Franks*, a search warrant must be voided and the fruits thereof suppressed after a hearing only if: (1) the defendant established perjury or reckless disregard by a preponderance of the evidence; and (2) the affidavit's remaining content is insufficient to establish probable cause.  438 U.S. at 156.  Based on the second requirement, a defendant is not entitled to a hearing unless he shows that but for the falsified facts there would not have been probable cause to issue the warrant.  *United States v. Jenkins*, 901 F.2d 1075, 1080 (11th Cir. 1990).  It is appropriate, therefore, for a court to analyze a *Franks* motion by removing the allegedly tainted information and inserting any alleged material omission, and then denying the motion if the affidavit, as amended, would nonetheless establish

65

probable cause.  *United States v. Kapordelis*, 569 F.3d 1291, 1309-10 (11th Cir. 2009).

### 4.      Analysis

As an initial matter, before considering the *Franks* issue, I conclude that the affidavit, on its face, sufficiently established probable cause for the issuance of the warrant.  Contrary to Jackson's assertion, the affidavit does link the 9328 phone to a crime, pointing out it was used in the vicinity of two June robberies.  [*See* Doc. 122-1 at 9.]  Moreover, it attested to the fact that the 1788 phone was likely used by the same person as the 9328 phone, and the 1788 phone was sufficiently linked to the May robbery.  There was a fair probability, therefore, that the user of the 9328 phone was involved in a crime, and that the use of GPS tracking on that phone would lead police to the phone's user.

Jackson essentially acknowledges that his *Franks* motion is premature in that he has not, at present, made an offer of proof.  [*See* Doc. 113 at 4.]  Accordingly, the motion is due to be denied without prejudice.  I therefore **RECOMMEND** that Jackson's Motion to Suppress GPS Search Warrant [Doc. 45] be **DENIED WITHOUT PREJUDICE**.

66

**H.      Jackson's Motion to Suppress Pen Trap and Trace [Doc. 46]**

Jackson moves for the suppression of evidence obtained from an order authorizing the use of a pen register and trap and trace.  [Doc. 46.]  When filed, in October 2015, he stated that he would need more time to review the underlying documents and perfect the motion.  [*Id.*]  To date, Jackson has not perfected the motion.

The government responds that the pen register does not implicate the Fourth Amendment.  [Doc. 123 at 2.]  Moreover, the statute authorizing pen registers says nothing regarding exclusion of evidence if there is a violation.  [*Id.*]

Jackson acknowledges that his motion is not yet sufficient and has not yet supplemented the motion.  Accordingly, I find it appropriate to deny the motion in Doc. 46 without prejudice.  I therefore **RECOMMEND** that Jackson's Motion to Suppress Pen Trap and Trace [Doc. 46] be **DENIED WITHOUT PREJUDICE**.

**I.      *Daubert* Motions**

**1.      Applicable Standard**

In *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579 (1993), the Supreme Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony.  In response to *Daubert*, Federal Rule of Evidence 702 was amended to provide general standards that the trial court must

use to assess the reliability and helpfulness of the proffered expert testimony.  Rule 702 provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Court's decision of whether to conduct a *Daubert* hearing is discretionary.  *See, e.g., Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1252 n.10 (11th Cir. 2007) (recognizing that although *Daubert* hearings "are often helpful, hearings are not prerequisite to such determinations under the Federal Rules or established law"); *see also United States v. Rodriguez*, 591 F. App'x 897, 899 (11th Cir. 2015) (holding that district court did not err in not holding a *Daubert* hearing regarding anticipated testimony concerning historical cell site analysis and

68

explaining "it is clear that a district court need not conduct a *Daubert* hearing where one would be unnecessary").

## 2.   *Daubert* Motion Relating to DNA Expert [211]

### a.   The parties' arguments.

The government has advised that it intends to call a forensic biologist as an expert concerning DNA that was recovered from a black knit ski mask recovered at the scene of one of the home invasions at issue in this case. Jackson filed a preliminary motion to exclude the evidence [Doc. 72], and after the government produced the forensic biologist's laboratory report, he filed a perfected motion to exclude the evidence and moved for a *Daubert* hearing [Doc. 211]. The government opposes the motion [Doc. 243].

The government's pretrial expert disclosure includes a laboratory report from the Division of Forensic Sciences at the Georgia Bureau of Investigation. [*See* Doc. 211-1.] In the report, forensic biologist Ronald P. Schmidt states his opinion that the DNA sample obtained from Jackson matched the DNA obtained from the mask. [*Id.*] Schmidt reported that swabbing was recovered from the "outer mouth" and "inner mouth" areas of the ski mask, that DNA isolation and amplification procedures were performed, and that electrophoretic separation was used to classify

69

the amplification products.  He explained that the amplification procedures were conducted for the "STR loci D8S1179, D21S11, D7S820, CSF1PO, D3S1358, TH01, D13S317, D16S539, D2S1338, D19S433, vWA, TPOX, D18S51, D5S818, FGA and the amelogenin locus" and that the profile obtained from both the inner and outer mouth areas of the mask "matches the profile of Mario Jackson using the loci D8S1179, D21S11, D7S820, CSF1PO, D3S1358, TH01, D13S317, D16S539, D2S1338, D19S433, vWA, TPOX, D18S51, D5S818, FGA and amelogenin." [*Id.*] Based on those results, Schmidt stated that "[w]ith a reasonable scientific certainty" that the DNA obtained from the mask matches that of Jackson.  [*Id.*]

Jackson does not challenge the validity of the scientific methodology of the DNA testing that forms the basis of Schmidt's opinion.  Rather, Jackson argues that "[t]here is no indication here that the collection methods employed were reasonably based on scientific principles, and any testimony derived therefrom falls victim to the same deficiencies." [Doc. 221 at 4-5.]  He goes on to argue that "the methods employed were in derogation of forensic manuals produced by the GBI, the Laboratory Division of the FBI, and the Department of Justice." [*Id.*]  But he does not point to any evidence that suggests those methods were not employed—in fact, Jackson states that Schmidt's report does not state how the mask was collected,

where the mask was found, or how it was transported to the GBI lab for analysis. [*Id.* at 4.]  In short, Jackson offers little more than speculation that the mask was contaminated in a manner that would compromise the DNA analysis.

This Court's decision in *United States v. Warnock*, 1:14-cr-015-AT, 2015 WL 7272208 (N.D. Ga. Nov. 16, 2015), is on point.  In *Warnock* the government's expert witness opined that DNA obtained from a respiratory mask matched that of the defendant.  The defendant moved to exclude DNA evidence and hold a *Daubert* hearing to determine the admissibility of the evidence on the ground that the defects in the collection and transfer process of the mask may have contaminated the mask and the sampling process.  2015 WL 7272209, at *1.  The Court denied defendant's request, explaining that the defendant's concerns about the collection and transfer procedures go to the weight of the evidence, but not the reliability of the DNA testing itself.  *Id.*; *see also United States v. McCluskey*, 954 F. Supp. 2d 1224, 1263-64 (D.N.M. 2013) ("Defendant's vague, speculative suggestions that there may have been contamination or mislabeling are matters going to the weight of the DNA evidence, not its admissibility.").

The purpose of a *Daubert* hearing is to determine whether a methodology is sufficiently reliable to be presented to a jury.  *See* Fed. R. Evid. 702.  Here, Jackson

71

merely questions that the accuracy of the information that Schmidt analyzed, not the reliability of the methodology that was used.  In the absence of any showing that the methods for DNA testing in this case was even potentially unreliable, no *Daubert* hearing is necessary, and Jackson's motion should be denied. Accordingly, I **RECOMMEND** that Jackson's Preliminary Motion to Set *Daubert* Hearing [Doc. 72] and Perfected Motion to Exclude DNA Evidence and Request for *Daubert* Hearing [211] be **DENIED**.

### 3.   *Daubert* Motions Relating to Cell Site Expert [252, 264, 294, 295][8]

The government has disclosed that it intended to call FBI Special Agent Chad Fitzgerald to testify concerning the cell phone records relating to the Defendants in this case.  [Doc. 264-1.]  According to the government's disclosure, "Agent Fitzgerald is expected to testify about the methods of cellular telephone communications and how those communications are made possible by sending signals to nearby cell site towers" and "the activity of the specific cellular telephones in relation to each of [the Defendants] in this case."  [*Id.* at 1.]  The government explained further that:

---

[8] Defendants Richardson, Redmond and Liverman have adopted Jackson's motions.  [Doc. 273, 291, 301, 302.]

72

Generally, Agent Fitzgerald is expected to explain that cellular telephone networks provide service to their customers through antennas deployed across the provider's coverage area. When the user places an outbound call, the handset transmits that communication over the airwaves to a nearby tower antenna, which relays the call to a local switch for routing. Conversely, whenever another party places a call to a user's cellular telephone, the network "pages" that phone to alert the owner to the incoming call; if the owner answers, the call is put through and (as before) carried by a tower near the phone. As a result, the system's awareness of a wireless phone's general whereabouts is essential to providing cellular service.

Spacing between antenna towers varies depending on a number of factors, especially terrain and population density. Except in sparsely populated areas, a typical tower will have three separate antenna faces (also called sectors), with each face serving a 120-degree portion of the roughly circular coverage area extending out from the antenna mast. Whenever a cellular phone user initiates or receives a communication – such as a voice call or text message – the carrier routinely creates a record, including the date and exact time, of the tower and sector handling the communication at the start and end of the communication. From the data collected by service providers, it is possible to determine the general geographic location area of a cell phone at a specific time. Agent Fitzgerald will explain these processes.

Additionally, his testimony will relate specifically to the activity of . . . cellular telephones, attributed to [the defendants]:

. . .

73

> Agent Fitzgerald is expected to testify that cell site data for each cell phone number will show that signals from their phones were received by cell towers near the locations of one or more robberies identified in the Second Superseding Indictment at times close to the times of the robberies with which each defendant is charged in the Second Superseding Indictment.

[*Id.* at 1-2; *see also* Doc. 279 at 2-3 (summarizing Agent Fitzgerald's anticipated testimony).] The government also provided defense counsel with a copy of Agent Fitzgerald's curriculum vitae ("CV").[9] [Doc. 264-2.]

On May 16, 2017, I held a *Daubert* hearing to determine whether Fitzgerald's proposed testimony is sufficiently reliable to be presented to a jury. Agent Fitzgerald testified at the hearing. Citations to the transcript of that hearing are noted as "May 16, 2017 Hr'g at __." Following the hearing, the parties filed post-hearing briefs. [Docs. 316, 319, 320,331.]

---

[9] In its disclosure, the government states that it does not concede that Agent Fitzgerald's testimony falls under Rule 702. [*See* Doc. 264-1 at 1.] Richardson has also questioned whether expert testimony is necessary to explain cell site location information, and that a wireless provider's custodian of records could provide sufficient testimony. [*See* Doc. 316 at 3.] Jackson, on the other hand, argues in his supplemental motion that Agent Fitzgerald's testimony is expert testimony. [Doc. 295 at 2-3.] The government does not respond to that argument. For purposes of my analysis, I assume that Agent Fitzgerald's testimony would qualify as expert testimony, and therefore analyze it under Rule 702. I make no finding, however, as to whether some portion of his testimony could properly be offered as lay testimony at trial.

74

Defendants challenge Agent Fitzgerald's anticipated testimony on both procedural and substantive grounds.  As a matter of procedure, Defendants contend that the government has failed to adequately disclose Agent Fitzgerald as an expert as required by Rule 16(a)(1)(G), the rule that requires the government to provide information to the defense regarding its anticipated expert witness testimony.  Specifically, Defendants contend that Agent Fitzgerald's testimony about his anticipated opinion contradicts the government's Rule 16(a)(1)(G) disclosure, in that Agent Fitzgerald stated at the May 20 hearing that he will only identify a tower that a cell phone used and depict the tower on a map, but that will not opine that a cell phone was near a particular crime scene.  Instead, other witnesses will testify as to the locations of the crime scenes.  [Doc. 319 at 6; Doc. 320 at 2.]

I find Defendants' argument unconvincing.  The government's disclosure states that Agent Fitzgerald is expected to testify that the cell site data for each cell phone number in this case will show that signals from the phones was received by towers near the locations of the robberies relevant to this case.  [Doc. 264-1 at 2.] Perhaps the disclosure could have been more precisely worded; however, it is readily apparent that Agent Fitzgerald will offer testimony regarding the locations of cell towers that received signals.  Further, to the extent that there is ambiguity

as to the contours of Agent Fitzgerald's opinion, defense counsel have now had the opportunity to cross-examine Agent Fitzgerald concerning the anticipated opinion.

Defendants also argue that the government's disclosure is flawed because Agent Fitzgerald's testimony contradicts the government's Rule 16 disclosure because, at the *Daubert* hearing, Agent Fitzgerald testified that he had no opinion at the present time concerning the locations of Defendants' phone numbers, as he had not yet analyzed the records or produced a report. (*See* May 20, 2017 Hr'g Tr. at 38-39, 65.) [Doc. 319 at 6.] This argument is also not persuasive. True, as of the date of the *Daubert* hearing, Agent Fitzgerald had not yet analyzed the particular phone numbers in this case, but the government has informed Defendants what it anticipates his ultimate opinion will be, and Agent Fitzgerald has described the methodology that he will ultimately use. Accordingly, I find no violation of Rule 16 that would warrant exclusion of Agent Fitzgerald's anticipated testimony.[10]

---

[10] Rule 702 requires that for a witness to testify as an expert at trial, he must have "reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(d). At this point Agent Fitzgerald has not applied his methodology to the facts of this case. Accordingly, although I recommend denying the motions to exclude Agent Fitzgerald's testimony, I do so subject to Defendants' renewal of the motion at trial upon the application of his methodology to the facts of this case.

Turning next to Defendants' substantive challenges to Agent Fitzgerald's anticipated testimony, I note that, as a preliminary matter, Defendants do not challenge Agent Fitzgerald's qualifications, and I readily conclude that he is qualified to testify as an expert in cell cite analysis.  Specifically, his CV and testimony establish that he has extensive, education, training and experience in the fields of telecommunications and historical cell site analysis, and he has lengthy history of testifying in federal court proceedings that his qualified.  [Doc. 307-2 at 9 (Agent Fitzgerald's CV); May 16, 2017 Hr'g Tr. at 8-16.]

Defendants instead focus their argument on the reliability of Agent Fitzgerald's methodology.  According to Jackson, the analysis of historical cell site data is an "emerging area for law enforcement" and there are "serious questions" about the reliability of such data.  [Doc. 264 at 6.]  Jackson identifies several reasons why historical cell site data may be questionable, including that telecommunications networks exist for the purpose of facilitating communications, not law enforcement; the reliability of cellular site data varies greatly; pinpointing a cellular signal to a particular tower does not necessarily show where the cellular subscriber is located in relation to the tower; the quality of data can vary as a phone travels from one location to another; and the cell phone tower to which a call

connects may depend on many factors other than the location of a particular device. [*Id.* at 7.] Defendants also point out that there are no established error rates regarding fundamental assumptions in Agent Fitzgerald's testimony, including that cell phones latch onto the strongest available signal, that the strongest available signal is always the closest tower, or that a cell phone is always located within the standard geographic area that the tower was set up and tuned to cover. [Doc. 319 at 8; Doc. 320 at 4.]

Courts from around the country, including other Judges in this District, have found Agent Fitzgerald's testimony, as well as similar testimony, to be based on reliable methods. *See, e.g., United States v. Foster*, No. 1:16-CR-128-MHC-CMS-2 (N.D. Ga. May 11, 2017) (Docket entry 160) (rejecting *Daubert* challenge to Agent Fitzgerald's anticipated testimony regarding general location of the phones relative to the cell towers near the sites of the robberies and to the times the phones were used to make calls that transmitted through those towers) (adopted by Order dated June 9, 2017, Docket entry 170); *United States v. Jackson*, No. 1:14-cr-77-TWT (N.D. Ga. Aug. 11, 2015) (Docket entry 74) (denying *Daubert* motion challenging Agent Fitzgerald's proposed cell site testimony without evidentiary hearing because his "credentials are established as an expert in this arena, and

78

because the historical cell site methodology underpinning his testimony is widely accepted); *see also, e.g.*, *United States v. Lewisbey*, 843 F.3d 653, 659 (7th Cir. 2016) ("Using call records and cell towers to determine the general location of a phone at specific times is a well-accepted, reliable methodology."); *United States v. Frazier*, No. 2:15-CR-044-GMN-GWF, 2016 WL 4994956, at *3 (D. Nev. Sept. 16, 2016) (holding that Agent Fitzgerald's proposed expert testimony regarding historical cell site analysis was admissible without the need for an evidentiary hearing); *United States v. Johnson*, No. 14-CR-00412-TEH, 2015 WL 5012949, at *6 (N.D. Cal. Aug. 24, 2015) ("Historical cell site evidence has consistently been found admissible by federal courts."); *United States v. Jones*, 918 F. Supp. 2d 1, 5 (D.D.C.2013) ("[T]he use of cell phone location records to determine the general location of a cell phone has been widely accepted by numerous federal courts.").

Defendants' challenge lies in assumptions that Agent Fitzgerald makes that might call into question the accuracy or reliability of his opinions concerning the location of phones.  [*See, e.g.,* Doc. 319 at 8; Doc. 320 at 3-4.]  But those assumptions go to the weight of Agent Fitzgerald's testimony, rather than its admissibility, which defense counsel can on cross examination.  *See United States v. Porter*, No. CR 13-66, 2016 WL 538456, at *4 (E.D. La. Feb. 10, 2016) ("[T]o

the extent that the proffered expert testimony relies on assumptions about the strength of the signal from a particular tower, [defendant's] challenges to those assumptions go to the testimony's weight, not its reliability."); *United States v. Pembrook*, 119 F. Supp. 3d 577, 597-98 (E.D. Mich. 2015) ("[T]o the extent that [the agent] has made assumptions about signal strength that call into question his estimate of where the phones were located at particular times, Defendants can test those assumptions on cross exam."); *United States v. Rosario*, No. 09-CR-415-2 VEC, 2014 WL 6076364, at *2 (S.D.N.Y. Nov. 14, 2014) (stating that the "vagaries of cell phone technology affect the persuasiveness of the circumstantial evidence, but they do not render his testimony inadmissible"); *United States v. Fama*, No. 12-CR-186 WFK, 2012 WL 6102700, at *4 (E.D.N.Y. Dec. 10, 2012) (recognizing that "factors that purportedly can impact the communication of a cellular phone and a particular cellular tower . . . go to the weight of [the expert's] testimony, not [its] reliability.").[11]

---

[11] Jackson's reliance on *United States v. Frazier*, 387 F.3d 1244 (11th Cir. 2004), a criminal sexual assault case, is misplaced. In *Frazier*, a defense expert's opinion was excluded because his purported methodology amounted to little more than his *ipse dixit* assertion that he would have "expected" to find defendant's bodily fluids and pubic hair on the victim if the defendant had, in fact, had intercourse with the victim. Such an opinion, the court explained, fails under *Daubert* because the reliability of the methodology is incapable of being examined

I am further persuaded that Agent Fitzgerald's testimony should be admitted because in December 2014, the Honorable Amy Totenberg, the District Judge presiding over this case, conducted an evidentiary hearing with respect to Agent Fitzgerald under similar circumstances and concluded that his proposed testimony was sufficiently reliable.  *See United States v. Thornton*, 1:13-cr-466-AT.  In *Thornton*, the government disclosed that it would offer Agent Fitzgerald's testimony concerning "the functioning of cellular communication networks, the fundamentals of cell site analysis, and the application of such analysis to the cellular telephone and cellular tower data in [that] case."  *See United States v. Thornton*, 1:13-cr-466-AT (N.D. Ga. Dec. 19. 2014) (Docket entry 65).[12]  After a lengthy hearing, the Court concluded that Agent Fitzgerald was qualified as an expert and that his anticipated testimony was "congruent with his experience and

_____

on cross-examination.  *Id.* at 1252-55.   Here, by contrast, Agent Fitzgerald's opinion is not based anything approaching an *ipse dixit* methodology.   As demonstrated by defense counsel at the hearing, the methods and assumptions underlying his opinion are susceptible to being tested on cross-examination.

[12] The Eleventh Circuit has approved a trial court's consideration of testimony taken in other cases from the same expert on similar matters in determining whether to hold a *Daubert* hearing.  *See Rodriguez*, 591 F. App'x at 899-900 (holding that trial court did not abuse its discretion in not holding a *Daubert* hearing where the court "had available to it the testimony of the same witness, on the near identical issue, from a case before a different judge in the same court").

[did] not exceed the scope of the referenced methodology that may reliably support his testimony." *Id*.  In reaching its conclusion, the Court noted that it would be concerned if Agent Fitzgerald were attempting to render pinpoint the precise location of a cellular telephone call using cell technology, but that the government represented that it would not elicit testimony regarding the specific location of a phone call. *Id.* at 2.

As in *Thornton*, the government has indicated that at trial in this case, it will not use Agent Fitzgerald's testimony to establish the precise location of any particular device.  Specifically, in its response brief, the government states that Agent Fitzgerald will not testify that any of the defendants' phones were in a precise location during the calls, rather, he will testify to the general location of the phones relative to cell towers near the sites of the alleged robberies and the times the phone was used.  [Doc. 279 at 3.]  Likewise, the government's summary of Agent Fitzgerald's testimony reports that the cell phone data makes it possible to determine ***general*** geographic location information and that Agent Fitzgerald would testify that the signals from the defendants' cell phones were received by towers near the alleged robberies.  [Doc. 264-1 at 2.]

In sum, I find that the government has sufficiently demonstrated that Agent Fitzgerald is qualified to testify regarding historical cell site location information under the circumstances of this case.  Given the overwhelming acceptance of cell site information and the lack of a novel challenge to the underlying methodology, I **RECOMMEND** that Jackson's Perfected Motion to Exclude Historical Cell Site Location Information and Request for *Daubert* Hearing [Doc. 252]; Jackson's Supplemental Motion in Limine to Preclude or Limit Testimony as to Mario Jackson's and Other Defendants' Locations Based Upon Cellular Tower Information and for *Daubert* Hearing Regarding Same [264]; the Perfected Motion to Exclude Historical Cell Site Location Information [294]; and the Supplemental Motion in Limine to Preclude or Limit Testimony as to Mario Jackson's and Other Defendants' Locations Based Upon Cellular Tower Information and for *Daubert* Hearing Regarding Same [295] be **DENIED**, subject to renewal at trial upon the application of his methodology to the facts of this case.

## II.    Motion Relating to Defendant Redmond

### A.    Redmond's Motion to Suppress Statements [Doc. 97]

Redmond moves to suppress his statement of his mobile phone number to law enforcement, which he made after his arrest and before any *Miranda* warning.

83

[Doc. 226.[13]] According to Defendant Redmond, he was arrested on November 5, 2015, and at the beginning of the post-arrest interrogation, law enforcement agents asked him for biographical information, including his cell telephone number, which he provided. [Doc. 226 at 2.] Defendant had not been given *Miranda* warnings prior to making that statement, and he contends that it should be suppressed for that reason. The government has now represented that it will not use Redmond's interview statement about his cell phone number. Accordingly, Redmond's motion should be **DENIED AS MOOT**.

### III. Conclusion

In sum, I **RECOMMEND** that:

- Jackson's Motion to Suppress Evidence Resulting from Unlawful Warrantless Seizure [Doc. 27] be **DENIED**;

- Jackson's Motion to Suppress Statements [Doc. 28] be **DENIED**;

- Jackson's Motion for Return of Seized Property [Doc. 29] be **DENIED**;

---

[13] Redmond initially moved to suppress statements that he made to FBI agents after his arrest. [*See* Doc. 97.] According to Redmond, he requested counsel; however, questioning continued. The government has agreed not to use statements from that point forward at trial, except to impeach Redmond should he testify at trial. [*See* Doc. 237 at 1-2.]

84

- Jackson's Preliminary Motion to Suppress Identification Testimony [Doc. 31] be **DENIED**;

- Jackson's Motion to Dismiss Count Three in Light of *Johnson v. United States* [Doc. 30], adopted by Defendant Redmond [Doc. 108], be **DENIED**;

- Jackson's Motion to Suppress Buccal Swab and Fruits Thereof [Doc. 43] be **DENIED**;

- Jackson's Motion to Suppress Cellular Phone Search Warrant [Doc. 44], adopted by Defendant Redmond [Doc. 213], be **DENIED**;

- Jackson's Motion to Suppress GPS Search Warrant [Doc. 45], adopted by Defendant Redmond [Doc. 213], be **DENIED WITHOUT PREJUDICE**;

- Jackson's Preliminary Motion to Suppress Pen Trap and Trace [Doc. 46], adopted by Defendant Redmond [Doc. 213] be **DENIED WITHOUT PREJUDICE**;

- Jackson's Preliminary Motion to Set *Daubert* Hearing Regarding Reliability of CODIS DNA Match Evidence [Doc. 72] be **DENIED**;

- Jackson's Supplemental Motion to Dismiss 924(c) Counts (Three, Six, and Eight) in Light of *Johnson v. United States* [Doc. 109] be **DENIED**;

85

- Jackson's Supplemental Motion to Suppress Evidence from the Geo Location Warrant [Doc. 113], adopted by Defendant Redmond [Doc. 213] be **DENIED**;

- Jackson's Motion to Dismiss Counts Three, Six, Eight, Eleven and Thirteen in Light of *Johnson v. United States* [Doc. 210], adopted by Defendant Redmond [Doc. 213] be **DENIED**;

- Jackson's Perfected Motion to Suppress DNA Evidence and Request for *Daubert* Hearing [Doc. 211] be **DENIED**;

- Jackson's Perfected Motion to Exclude Historical Cell Site Location Information and Request for *Daubert* Hearing [Doc. 252], adopted by Defendants Redmond, Richardson, and Liverman [Doc. 293, 294, 308], be **DENIED**;

- Jackson's Supplemental Motion in Limine to Preclude or Limit Testimony as to Mario Jackson's and Other Defendants' Locations Based Upon Cellular Tower Information and for *Daubert* Hearing Regarding Same [Doc. 264], adopted by Defendants Redmond, Richardson, and Liverman [Docs. 293, 295, 308], be **DENIED**; and

86

- Redmond's Preliminary Motion to Suppress Statements [Doc. 97] be **DENIED**.

This Report and Recommendation resolves all matters pending before me relating to Defendants Jackson, Redmond, and Richardson.  I have not been advised of any impediments, including the need for additional discovery, to the scheduling of a trial as to those defendants.  Accordingly, this matter as to Defendants Jackson, Redmond, and Richardson is **CERTIFIED READY FOR TRIAL**.[14]

SO RECOMMENDED and CERTIFIED this 27th day of September, 2017.

_____
JOHN K. LARKINS III
United States Magistrate Judge

_____

[14] The only remaining defendant not yet certified ready for trial is Liverman, who has a motion to suppress currently pending before the Court.  Since matters pertaining to this defendant are still pending, the District Court is not required to place this case on the trial calendar at this time.  18 U.S.C. § 3161(h)(6).

87