IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL ACTION NO.: |
| v. | 1:15-cr-284-AT-JKL-1 |
| MARIO JACKSON, | |
| Defendant. | |

## UNITED STATES MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON DEFENDANT MARIO JACKSON'S COMPETENCY

This case has been referred to the undersigned Magistrate Judge for a recommendation on Defendant Mario Jackson's competency to stand trial. [*See* Doc. 481.] On April 2, 2021, I held a competency hearing. After considering the evidence of record and argument of counsel, I **RECOMMEND** that Mr. Jackson be found competent to stand trial, as he is not presently suffering from a mental disease or defect rendering him unable to understand the nature and consequences of the proceedings against him, to consult with his lawyer with a reasonable degree of understanding, or to assist properly in his defense.

## I.   BACKGROUND

At the behest of his counsel,[1] on April 26, 2019, the undersigned issued an order for a psychiatric evaluation of Mr. Jackson [Doc. 438], and on June 4, 2019, again through counsel, Mr. Jackson filed a motion for a competency hearing to determine his mental fitness to stand trial [Doc. 443].  In that motion, Mr. Jackson indicated that his retained psychiatrist, David M. Halverson, M.D., had concluded that Mr. Jackson is not competent to stand trial.[2]  [*Id.*]

On June 24, 2019, the government moved to have its own expert evaluate Mr. Jackson's competency.   [Doc. 449.]   The Court granted the government's motion [Doc. 457], and on October 29, 2019, the government advised the Court that its expert expected to complete his evaluation and produce a report by December 1, 2019 [Doc. 472].  The Court set a competency hearing for January 10, 2020, and the case was decertified for the undersigned to conduct the hearing and

---

[1] Mr. Jackson was on his fifth attorney by that point.  His first two attorneys had an unwaivable conflict of interest [*see* Doc. 332], while the next two withdrew voluntarily [*see* Docs. 333, 366, 370, 412].  Mr. Jackson's present counsel, attorney Jeffrey L. Ertel, appeared in the case in November 2018.  [Doc. 420.]

[2] At the time, Dr. Halverson had not completed a written report but instead had conveyed his findings to defense counsel.  [Doc. 443 at 3 n.1.]  Dr. Halverson's report was completed on August 19, 2019.  (*See* Def. Ex. ("DX-") 1 (Report of Dr. Halverson), located at Doc. 598-1.)

issue the present report and recommendation.  [Doc. 481; *see also* Doc. Entry dated Nov. 18, 2019.]

Dr. Halverson memorialized his findings in a letter report dated August 19, 2019, which Mr. Jackson submitted during the competency hearing.  (*See* DX-1.) Dr. Halverson reviewed Mr. Jackson's police and criminal records, prison medical records, and juvenile court records, and then conducted a four-hour interview of Mr. Jackson on May 2, 2019.  (*Id.* at 1-3.)  It does not appear that Dr. Halverson spoke with any of Mr. Jackson's previous attorneys or included any observations from Mr. Jackson's present counsel.  (*See id.* at 1-2 ("Sources of Information").)

Mr. Jackson provided Dr. Halverson with some personal background.  He reported that he was raised primarily by his grandmother until she passed away when he was 10 years old; after that, he spent his teenage years living with a transgender woman who cared for him, but also subjected him to physical and sexual abuse.  (DX-1 at 3.)  Mr. Jackson reported taking special education classes and leaving school permanently after being expelled in 10th grade; after his expulsion, Mr. Jackson never obtained employment and has not had a partner or children.  (*Id.*; *see also id.* at 8.)  Mr. Jackson had run-ins with law enforcement during his youth and described a history of truancy, assault, and theft that left him

3

in the juvenile detention system. (*Id.* at 4.) Mr. Jackson appears to have cycled regularly through the juvenile detention system until adulthood; he then entered the Tennessee Department of Corrections in September 2011. (*See id.* at 6-7.) Mr. Jackson reported a history of regular drug use to "calm" and "relax" him and to "help the mental pain." (*Id.* at 6.)

In terms of his psychiatric history, Mr. Jackson claimed to have problems with "tantrums" starting at seven or eight years old; however, he never received psychiatric care until entering the juvenile detention system. (DX-1 at 5.) He claimed to have been diagnosed with depression, hospitalized for it three or four times, and attempted suicide three times. (*Id.*) Mr. Jackson also reported having obsessive-compulsive tendencies (needing to touch things three times); symptoms of post-traumatic stress disorder ("PTSD") from a stabbing in a Tennessee prison; alcohol and drug problems; and multiple personalities. (*Id.* at 5-6.) Dr. Halverson noted that Mr. Jackson's medical records included notes about and treatment for depression, suicidal ideation, and marijuana abuse, but also included discussions of his uncooperativeness with mental health providers, lack of effort in testing, non-compliance with treatment and medication, and the absence of any symptoms of

4

psychosis, hallucinations, or delusions [3] while incarcerated in the Tennessee Department of Corrections or at the United States Penitentiary in Atlanta ("USP-Atlanta"). (*Id.* at 7-8.) When Mr. Jackson was transferred to USP-Atlanta in 2015, he was initially diagnosed with schizophrenia, bipolar disorder, and depression, but by 2016, his records make no mention of bipolar disorder, they show that the schizophrenia had "improved," and they list only "depressive disorder not elsewhere classified." (*Id.* at 8-9.) Mr. Jackson explained that he was suspicious and distrusting of "most people around him," and that as a result, "he has intentionally gotten into conflicts" in order to be moved to solitary confinement. (*Id.* at 9-10.) In a similar vein, Mr. Jackson said that he did not trust his healthcare providers, and "now I just tell them I'm good." (*Id.* at 10.)

In conducting his mental health exam, Dr. Halverson noted that Mr. Jackson was "alert, calm, and generally cooperative," that he requested clarification when necessary, and became more conversant as the exam progressed. (DX-1 at 9.) Dr. Halverson assessed Mr. Jackson as having below average intellectual

---

[3] Dr. Halverson noted later than Mr. Jackson took antipsychotic medication not to alleviate any psychotic symptoms but simply to "calm" himself; and hypothesized that Mr. Jackson's emotional dysregulation was a function of his borderline intelligence. (DX-1 at 13.)

5

functioning—he demonstrated problems with retaining information, math calculations, spelling, and problem solving[4]—but still found his responses to assessment questions "appropriate." (*Id.* at 10-11.) Dr. Halverson diagnosed Mr. Jackson with PTSD, unspecified obsessive-compulsive disorder, and a provisional unspecified intellectual disability. (*Id.* at 11.) While Dr. Halverson considered the possibility Mr. Jackson was malingering, he rejected the conclusion because he did not believe that Mr. Jackson exaggerated his symptoms, and because Mr. Jackson was mostly cooperative, appeared to make an effort to answer some questions, and wanted to represent himself in court, which Dr. Halverson believed made it "unlikely" that he was "feigning psychiatric deficits." (*Id.* at 13-14.)

Evaluating his competency to stand trial, Dr. Halverson broke down Mr. Jackson's then-present abilities. Although Mr. Jackson did not understand all the nuances, he knew he was facing charges relating to entering a family's home and robbing them; that he could face more than 25 years in prison if convicted; that he could enter pleas of guilty or not guilty; and generally what roles the judge, prosecution, defense, and jury played. (DX-1 at 12.) Dr. Halverson also wrote that

---

[4] Dr. Halverson did not conduct any formal testing of Mr. Jackson's intellectual functioning. (*See* Hr'g Trans. ("Tr.") at 12, located at Doc. 591.)

he believed he made some progress "educating" and "discussing" legal concepts with Mr. Jackson. (*Id.*)  When asked about his attorneys, Mr. Jackson said he had "difficulty understanding the details of his defense" because he was "mostly illiterate" and the attorneys use "10-letter words"; but Mr. Jackson also stated that he did not fully trust his attorney not to work with the prosecution and that he was thinking about representing himself. (*Id.* at 12-13.)  Dr. Halverson noted that Mr. Jackson was not able to "rationally discuss some options for his defense." (*Id.* at 13.)  In the end, based upon Mr. Jackson's distrust, irritability, and borderline intellectual functioning, Dr. Halverson opined that Mr. Jackson:

> did not demonstrate an adequate understanding of the possible pleas, plea bargaining, and courtroom procedure.  He expressed the thought of going pro se, but he did not demonstrate the ability to present a rational defense, nor would he be able to navigate the legal process if he were to proceed pro se.  At the time of this examination, Mr. Jackson did not demonstrate an ability to discuss his case rationally and he could not adequately assist his attorney in his defense.

(*Id.* at 13.)  As a result, Dr. Halverson concluded that Mr. Jackson was not competent to stand trial at the time of the evaluation. (*Id.* at 14.)

Significantly, though, Dr. Halverson also highlighted that Mr. Jackson could be restored to competency.  Dr. Halverson specifically noted (1) that Mr. Jackson's distrust and emotional issues were "not of psychotic origin," but "learned behavior,"

7

and (2) that "[o]ver the course of the evaluation, [he] did seem to understand some basic legal education" and was "more willing to discuss his legal matters."  (*Id.*) Based upon these observations, Dr. Halverson concluded his report by noting that "there is substantial probability Mr. Jackson will be restored to competency to stand trial in the foreseeable future."  (*Id.* at 14.)

At a status conference on December 5, 2019, the parties advised the Court that, contrary to their earlier representations, the defense expert's report was not yet finalized and—more concerningly—that the government's expert had not even begun an examination of Mr. Jackson.  [*See* Docs. 485, 486.]  The undersigned set a deadline of December 17 for the parties to complete and exchange their reports; however, the parties were again unable to meet that deadline, this time because the government was unable to get access to Mr. Jackson.  [Docs. 486, 487; *see also* Doc. Entry dated Nov. 22, 2019.]  The government was given until January 6, 2020, to furnish its final expert report [Doc. 493], but was again unable to meet that deadline, this time because Mr. Jackson refused to meet with the government's expert [*see* Doc. 495].  Mr. Jackson's obstreperousness would become an ongoing issue.

8

The Court reordered Mr. Jackson to sit for a competency examination and reset the competency hearing for the end of January 2020.  [Doc. 497 at 10.] Unfortunately, Mr. Jackson persisted in his refusal to cooperate with any examination [*see* Doc. 498]; and so, on January 27, the Court remanded Mr. Jackson for examination at a suitable BOP facility pursuant to 18 U.S.C. § 4247(b). [Doc. 499.]  On February 10, 2020, Mr. Jackson arrived at the Federal Detention Center in Miami, Florida ("FDC-Miami"), where he underwent a forensic evaluation by forensic psychologist, Carmen Rodriguez, Psy.D., over a 45-day period.  [*See* Doc. 521 at 3-12 ("Rodriguez Report").]

Dr. Rodriguez presented her findings in a forensic evaluation report dated April 9, 2020.  (Rodriguez Report.)[5]  According to the report, at FDC-Miami, Mr. Jackson initially agreed to cooperate with the examination procedures, but later became recalcitrant and refused to complete the full battery of psychological testing. (*Id.* at  1.[6])  Nonetheless, Dr. Rodriguez was able to conduct a mental status examination and formulate an opinion as to Mr. Jackson's competency based on

---

[5] On April 9, 2020, the warden of FDC-Miami sent a copy of Dr. Rodriguez's report to the Court and counsel for the parties.  [Doc. 521.]

[6] In citing Dr. Rodriguez's report, the Court uses the page numbers of the report itself.

(1) her review of documents, including, among other things, court, police, and prison records; the competency report prepared by Dr. Halverson; and Mr. Jackson's medical, psychiatric, substance abuse, and criminal history records; (2) her and other staff members' observations of Mr. Jackson's behavior during his confinement at FDC-Miami (including occasionally violent and disruptive episodes); (3) monitored telephone calls and email communications; and (4) the portions of her own evaluation that she was able to complete.[7]  (*Id.* at 1-2.)  The staff at FDC-Miami sought "any relevant documents that are available (i.e., medical, psychiatric, academic records, prior evaluations, investigative reports, criminal history, etc. …)" from Mr. Jackson's counsel, among others, but it does not appear that he provided any additional information or material.  [*See* Doc. 507 at 1-2.]

After recounting Mr. Jackson's history (Rodriguez Report at 2-6),[8] Dr. Rodriguez diagnosed him with antisocial personality disorder; unspecified opioid-related disorder (based upon heroin use), in controlled environment; unspecified

---

[7] According to her report, Dr. Rodriguez completed her clinical interview and a mental status examination, but Mr. Jackson refused to complete the Georgia Court Competency Test and the Minnesota Multiphasic Personality Inventory. (Rodriguez Report at 2.)

[8] Drawn from the same sources as Dr. Halverson's history, Dr. Rodriguez's summary largely mirrors it.

cannabis-related disorder, in a controlled environment; unspecified alcohol-related disorder, in a controlled environment; and malingering (*id.* at 8-9).

Of note, Dr. Rodriguez considered material and information unavailable to Dr. Halverson.  First, she discussed multiple records from 2018 and 2019 that were not mentioned by Dr. Halverson, in which Mr. Jackson's "history of malingering" were discussed as it pertains to both his psychiatric and physical symptoms; indeed, Dr. Rodriguez highlighted that "[t]hroughout his incarceration at USP-Atlanta, psychology staff repeatedly noted that Mr. Jackson did not evidence any signs of mental health disorder."  (Rodriguez Report at 5.)[9]  Dr. Rodriguez also discussed Mr. Jackson's confinement at FDC-Miami, where he was disruptive and uncooperative, and where correctional staff "reported that [he] exhibited significant behavioral disruptions that were manipulative in nature," such as throwing feces and breaking fire sprinklers, "in attempts to achieve secondary gains (i.e. changing of housing, expedited return to USP-Atlanta)."  (*Id.* at 7.)  Along similar lines, she noted that during her examination, Mr. Jackson "demonstrated adequate attention

---

[9] By way of example, Mr. Jackson provided inconsistent accounts of whether he had "three personalities" and what their names were; alternatively endorsed and denied having auditory hallucinations; and complained of groin rashes and then denied they existed.  (Rodriguez Report at 5.)

and concentration skills when motivated to do so"; that his emotional problems appeared to be caused by frustration at not achieving some goal; that those emotional issues "were also observed to rapidly cease once [Mr. Jackson] obtained his desired goal"; and that "there were no signs of an active mental illness observed throughout the course of the evaluation." (*Id.* at 7, 9.)   Finally, Dr. Rodriguez questioned Mr. Jackson's claims of illiteracy and inability to self-regulate, highlighting that "electronic messages by [Mr. Jackson] demonstrated that he can clearly express himself through written communications," and that "[a] review of [his] monitored telephone calls revealed . . . organized thought processes, and intact memory abilities . . . [In fact,] when a request was denied by the listener, Mr. Jackson acknowledged his understanding and maintained his composure. . . . [He was also able to] discuss[] visitation rules, telephone usage rules, electronic messages, and he is careful of what he tells the listener due to his awareness that the calls are being monitored." (*Id.* at 8.)[10]

---

[10] Along similar lines, Dr. Rodriguez highlighted that the score that prior doctors—including Dr. Halverson—used to diagnose Mr. Jackson with borderline intellectual functioning was made prior to 2005 and that the test or assessment used to generate the score was unidentified; thus, in Dr. Rodriguez's view, the score should not be relied upon in understanding Mr. Jackson's intellectual abilities. (Rodriguez Report at 4; *see also* Tr. at 40 ("Yes, there was a report of, again an 82, which typically would be -- would fall into the average range of functioning.  But,

Dr. Rodriguez then summarized her clinical findings as follows:

> Mr. Jackson is a 32-year-old, African-American male, with a history of psychiatric treatment, substance abuse, and criminal activities. The defendant meets criteria for multiple classifications under the current system of diagnostic psychiatric disorders (DSM-5). Mr. Jackson's definitive classification of mental health conditions are confounded by several factors. First, there is evidence to suggest that Mr. Jackson has been uncandid in regards to his symptoms. Second, Mr. Jackson refused to participate in psychological testing. Finally, the defendant has a history of substance abuse, which could have mimicked or exacerbated prior symptoms of a mental illness.

> Mr. Jackson exhibited many tendencies which appeared to be of a long-standing, characterological nature. His idiosyncratic style of thinking, interpersonal difficulties, emotional expression, and asocial behaviors suggest the presence of a personality disorder. The diagnosis of Antisocial Personality Disorder is characterized by a combination of deceitfulness, impulsivity, aggressiveness, irresponsibility, lack of remorse and a failure to conform to social norms. Individuals with antisocial personality may also experience dysphoria, including complaints of tension, inability to tolerate boredom, and depressed mood. In addition, collateral records revealed significant symptoms of a conduct disorder during the defendant's adolescence, which is required for this classification. Therefore, the diagnosis of Antisocial Personality Disorder appears to best describe the defendant's symptoms in the pervasive characterological domain.

> The essential feature of Malingering is the intentional misrepresentation or exaggeration of physical or psychological symptoms for secondary gain, such as receiving diminished legal ramifications, obtaining financial compensation, evading criminal prosecution, or receiving medication. According to the DSM-5,

---

again, that's really hard to make much of without knowing really what the measure is.").)

Malingering should be considered when any of the following combinations occur:  lack of cooperation during the evaluation, there is evidence for the presence of Antisocial Personality Disorder, the presentation occurs in a medico-legal context, or there is a marked discrepancy between subjective and objective findings.  In Mr. Jackson's case, many of these conditions are present.  During the current evaluation, the defendant refused to cooperate with clinical interviews and psychological testing.  Furthermore, there were no signs of an active mental illness observed throughout the course of the evaluation, even without being prescribed psychiatric medications.   His medical records also suggest a history of malingering psychiatric symptoms, as well as physical ailments.  It is likely that the defendant is malingering psychiatric impairment due to a perception that he might avoid entirely, or receive diminished repercussions, for his alleged criminal behavior.  Based on these factors, Mr. Jackson meets criteria for a classification of Malingering.  While this classification does not exclude the presence of legitimate psychiatric conditions, it should be noted that he failed to display indications of an active phase of a serious mental illness during the course of the evaluation.

Collateral records indicate a history of substance use since early adolescence that has led to impairments in various domains including legal status.  He is presumed to have discontinued his drug use since his arrest due to restricted access.  This pattern of usage does not necessarily constitute true abstinence.  Therefore, the defendant appears to meet the criteria for use of the various substances with the added specifier 'in a controlled environment.'

(*Id.* at 9-10.)  Dr. Rodriguez went on to opine that while Mr. Jackson may benefit from individual psychotherapy and substance abuse treatment, his current mental status appeared to be stable.  (*Id.* at 10.)

14

As to Mr. Jackson's competency to stand trial, Dr. Rodriguez opined as follows:

> On an objective measure [] of legal knowledge and abilities related to trial competency, Mr. Jackson failed to identify where the judge sits in a simple illustration of the courtroom, citing "I don't know, I have only been to court once or twice." His response is highly unlikely given his numerous interactions with the legal system. Mr. Jackson refused to answer any further questions on this measure.
>
> Essential to the issue of competency to stand trial is whether or not a mental disease or defect is present and interfering with the defendant's ability to understand the charges against him, his ability to properly assist in his own defense, and the ability to understand the nature and consequences of the proceedings against him. While the true extent of his legal knowledge and abilities was difficult to determine given his lack of cooperation, the defendant demonstrated no symptoms of an active mental illness that would interfere with his rational understanding of the proceedings or his ability to assist toward his defense. Throughout the evaluation, the defendant's behavior appeared purposeful and under his volitional control. He appears to have no impairment that would prohibit an understanding of the legal process and ability to assist in his own defense if motivated to do so. Hence, the defendant's degree of trial competency is satisfactory, and it is recommended that Mr. Jackson be found Competent to Stand Trial.

(Rodriguez Report at 10.)

On June 16, 2020, Mr. Jackson moved to continue the competency hearing to obtain an updated report from Dr. Halverson, which was granted. [Docs. 528, 529.] Unrelated to the competency proceedings, Mr. Jackson suffered an assault after his return to USP-Atlanta. As a result, the competency hearing was continued.

15

It then was continued again due to delays in the evaluation occasioned by the COVID-19 pandemic and Mr. Jackson's refusal to meet with Dr. Halverson.  [*See* Docs. 543-56.]  On September 11, 2020, the Court was forced to reorder that Mr. Jackson be remanded to a BOP facility again to sit for a competency examination pursuant to 18 U.S.C. § 4247(b), and reset the competency hearing.  [Doc. 557.]

Mr. Jackson arrived at the Federal Medical Center in Devens, Massachusetts ("FMC-Devens") in late September 2020, where he underwent a forensic evaluation by forensic psychologist, Miriam Kissin, Psy.D.  (*See* Gov't Ex. ("GX-") 2 at 5 (Report of Dr. Kissin), located at Doc. 597-2; *see also* Tr. at 12.)  Reviewing much of the same materials as the prior evaluators—including Mr. Jackson's criminal and police records, his state and federal prison medical records, discovery materials from the present case, information about Mr. Jackson from the National Crime Information Center, and the reports of Drs. Halverson and Rodriguez[11]—Dr. Kissin noted:

> According to records, Mr. Jackson often remained non-compliant with medication treatment.  He was also reported [t]o endorse symptoms, for which there were no objective evidence.  This included

---

[11] Dr. Kissin solicited information from Mr. Jackson's present attorney, but did not reach out to earlier counsel.  (Tr. at 44-45.)  It does not appear that Mr. Jackson's attorney provided information or put Dr. Kissin in touch with prior counsel.

manifesting "multiple personalities."  Despite frequent complaints of
a variety of psychiatric symptoms, Mr. Jackson's mental status was
consistently described as primarily indicative of agitation and
uncooperative behaviors, rather than psychopathology.  He was noted
to consistently function independently and exhibit capacity for
adaptive social interactions, when choosing to do so.

(GX-2 at 4; *see also id.* at 7 ("Notably, he has repeatedly been assessed to malinger

symptoms of mental illness, typically for secondary gain.").)  Looking at more

recent records, Dr. Kissin also mentioned that in September 2020, Mr. Jackson was

"briefly placed" on suicide watch after a forced move, but that the watch was

removed after he denied suicidal ideation[12]; and that in October 2020, he requested

psychiatric treatment and medication because he was "doing crazy things," but that

the treatment was discontinued within a couple months due to "persisting non-

compliance," when he failed to take almost half of his doses.  (*Id.* at 5-6.)

Dr. Kissin also attempted to enlist Mr. Jackson's cooperation in conducting

mental health interviews and psychological testing but, like Dr. Rodriguez, was

largely unsuccessful due to his uncooperative behavior.  (GX-2 at 2; *see also* Tr. at

13.)  She was only able to formally interview Mr. Jackson on one occasion for a

---

[12] In December 2020, Mr. Jackson threatened to cut himself with a piece of
metal and was again placed upon suicide watch; that episode ended, however, when
he admitted doing it just so he could "take a ride in the ambulance to see the snow."
(GX-2 at 5.)

17

few hours in late December 2020 when he decided to be cooperative; otherwise, she had to speak with him through his cell door, which she did with some regularity, interviewing Mr. Jackson in this informal manner 15 to 20 times over the months he was at FMC-Devens.  (Tr. at 13, 21-22.)  As a result, Dr. Kissin was not able to ask Mr. Jackson many specifically competency-related questions or formally assess his intellectual capacity.  (*Id.* at 23-24, 35; *see also* GX-2 at 7, 9.)  Regardless, based upon her interview, discussions, and her (and staff's) observations, Dr. Kissin came to the following clinical formulation of Mr. Jackson:

> [U]pon review of his overall[] history, there is no substantive, reliable information demonstrating Mr. Jackson suffers from severe mental illness. . . . Notably, no display of psychosis or thought disordered were evident at any time throughout the course of the instant evaluation period.
>
> …
>
> [T]here is no indication any trauma-related symptoms he does experience [] significantly impact his day-to-day functioning and behavior.  Dr. Halvers[]on's diagnosis of OCD appears to have been made solely on the basis of Mr. Jackson's self-report of having to touch everything three times to stave off anxiety.  Notably, such behaviors were not observed in the course of the instant evaluation, nor is there indication these symptoms have caused any noted difficulties in Mr. Jackson's functioning.
>
> …

18

> [I]t is possible he manifests some degree of learning disability. However, in the course of the instant evaluation, Mr. Jackson presented with no evidence of significant cognitive deficits. While problematic behavior rendered him inappropriate for housing outside of the locked unit, Mr. Jackson exhibited full capacity to function adaptively in regard to interpersonal communication, and self-care. When willing to engage, he provided information about himself in an insightful, reflective, and relatively sophisticated manner. In light of the available information, Mr. Jackson's cognitive functioning is estimated to fall within the Low Average to Average Ranges of capacity.
>
> …
>
> Mr. Jackson's repeated[] engagement in problematic behaviors is best attributed to long-standing characterological factors, indicative of Antisocial Personality Disorder. Antisocial Personality Disorder is characterized by a social and interpersonal presentation marked by deceitfulness, irritability/aggression, impulsivity, lack of responsibility and remorse, need for stimulation, and depressed mood often manifesting in irritability and agitation. In addition, individuals with antisocial personality disorder typically exhibit conduct problems in adolescence. This diagnosis appears to be most consistent with Mr. Jackson's history and ongoing presentation.

(GX-2 at 7-8.) Based upon the foregoing, Dr. Kissin diagnosed Mr. Jackson with

Antisocial Personality Disorder. (*Id.* at 8.)

With regard to Mr. Jackson's competency to stand trial, Dr. Kissin opined

that:

> Mr. Jackson presents with a history of maladaptive social and interpersonal behaviors consistent with personality pathology, namely Antisocial Personality Disorder. This assessment is

consistent with that reached in the course of his most recent competency evaluation, conducted by Dr. Rodriguez.  Mr. Jackson has a noted history of malingering psychiatric symptoms for secondary gain.  His history and present functioning is inconsistent with severe mental illness. While he was unwilling to participate in a formal evaluation of his competency to stand trial, in the absence of significant psychopathology or cognitive defect, no basis exists for an opinion that Mr. Jackson is rendered incompetent due to mental illness.

In conclusion, based upon the available information, it is my opinion that Mr. Jackson's present competency-related skills are not significantly compromised by symptoms of a serious mental illness or defect, such that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

(GX-2 at 9-10.)  Dr. Kissin ended her report, stating:

Any maladaptive behaviors he may display including in the course of legal procedures are conceptualized to be in his volitional control. Given the nature of personality pathology, without significant motivation to actively engage in treatment geared toward developing, an improved interpersonal skill-set (notably absent in Mr. Jackson's case) Mr. Jackson would not be expected to evidence significant change in his pattern of problematic behaviors.

(*Id.* at 10.)

The undersigned conducted the long-awaited competency hearing on April 2, 2021.  [Doc. 590.]  Dr. Halverson' report, Dr. Kissin's curriculum vitae ("CV"), and Dr. Kissin's report were admitted into evidence.  (Docs. 597, 598.)  Dr. Kissin also offered her expert testimony without objection.  (Tr. at 4-61; *see also id.* at 11

20

(Dr. Kissin offered as expert).)  Neither Mr. Jackson nor Dr. Halverson testified; and the defense did not call any witnesses or present any other evidence.[13]  Dr. Kissin reiterated that while Mr. Jackson's uncooperative behavior left him in a locked unit and precluded some of the formal mental health testing, she was able to conduct one formal interview and many 10- to 15-minute interviews from his cell; between the interviews and her review of records, she concluded that Mr. Jackson "does not present with a serious mental illness, and as such he does not present with any impediments to his ability to participate in the legal process, work with his attorney, or make decisions regarding his criminal case."  (Tr. at 12-15, 21.)  Dr. Kissin emphasized that while she did not conduct formal testing, the sort of "cognitive deficits" the defense and Court was concerned with would "show up in one's interaction[s]" with Mr. Jackson and that he simply "did not exhibit any of those difficulties"—expressing himself, recalling information, combining pieces of information—that would render him incompetent.  (Tr. at 49-50.)

---

[13] Mr. Jackson's counsel stressed the importance of obtaining underlying notes and records from Dr. Kissin and FMC-Devens in order to challenge her conclusions (*see* Tr. at 63-66); however, since the hearing ended, Mr. Jackson has not complained that he was unable to obtain those records nor offered any rebuttal evidence.

Mr. Jackson was calm for the first half of the competency hearing. He communicated quietly with his attorney, as well as the United States Marshal supervising him, on several occasions, appearing to listen attentively and offer input on occasion. Midway through the hearing, however, as defense counsel sought to admit Dr. Halverson's report into evidence, Mr. Jackson erupted, demanding to know "why" Dr. Kissin would "make a report." (Tr. at 25-26.) The Court offered Mr. Jackson an opportunity to calm down, but warned him that he needed to stop the outburst. (*Id.* at 26-27.) Rather than stop, Mr. Jackson yelled about "Trump supporters tr[ying] to take me," demanded that Dr. Kissin tell everyone how "those folks tried to treat me there," and shouted that "Joe Biden is president." (*Id.*) When Mr. Jackson persisted, the undersigned was forced to have the Marshals remove him from the courtroom. (*Id.* at 28.) Defense counsel explained later that a staff member at FMC-Devens "accused [Mr. Jackson] of being involved in stealing the election from Donald Trump," and both he and Dr. Kissin agreed that, given past traumas,[14] Mr. Jackson feared white people and believed he was mistreated due to his race, both of which may have played a part

---

[14] Such as being stabbed while being held in the custody of the Tennessee Department of Corrections and the BOP. (Tr. at 33-34, 57.)

in his eruption.  (*Id.* at 33.)   Asked about it later, Dr. Kissin opined that Mr. Jackson's "uncooperativeness usually arose in the context of his expressing some displeasure . . . be[ing] loud, belligerent, angry and such."  (Tr. at 49.)

When Dr. Kissin was asked "whether Mr. Jackson could adequately confer with his lawyers," she responded that:

> He does not present with a major mental illness.  He also has full capacity to engage in very rational conversations when he chooses to do so where he discusses concepts, where he discusses things from his memory, where he's able to use information to talk about things that have happened to him, talk about the future -- so all, you know, general kinds of the engagement that one would have to utilize in the course of talking to one's attorney in terms of decision-making. . . .

> …

> [H]e presented with no limits in his capacity to understand any other concept, any other type of interaction, be able to engage appropriately, again, when he chose to do so in the course of, you know, the lengthy amount of time that he was here, and there is no reason that those skills would not be able to translate to his engagement with his attorney if he chose to do so.

(Tr. at 37-38.)  While she acknowledged that he could be "belligerent" and that there were occasions of "very problematic interactions with him," she explained that there was also "a lot of higher level of engagement," where Mr. Jackson was calm and able to express his views about what he wanted and why.  (*Id.*)  She

believed his outbursts and noncompliance were volitional and manipulative behavior, and therefore did not amount to incompetency.  (*Id.* at 60-61.)

The remaining evidence will be discussed as necessary in the analysis below.

## II.    APPLICABLE STANDARD[15]

The Due Process Clause of the Fifth Amendment prohibits the government from trying a defendant who is incompetent.  *United States v. Dixon*, 901 F.3d 1322, 1341 (11th Cir. 2018); *see also Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996) ("Competence to stand trial is rudimentary, for upon it depends the main part of those rights essential to a fair trial, including the right to effective assistance of counsel, the right to confront and cross-examine witnesses, the right to testify on one's own behalf without penalty for doing so.") (quoting *Riggins v. Nevada*, 504 U.S. 127, 139-40 (1992)).  Court precedent and 18 U.S.C. § 4241, *et seq.*, guide the

---

[15] The Court notes that they competency standard for pleading guilty is the same as the test for competency to stand trial.  *Godinez v. Moran*, 509 U.S. 389, 398-402 (1993); *see also United States v. Rodriguez*, 751 F.3d 1244, 1252 (11th Cir. 2014).  A change-of-plea hearing had been scheduled for Mr. Jackson.  [*See* Doc. Entry dated July 15, 2020.]  Although it appears that Mr. Jackson intends to persist in his plea of not guilty at this time, this recommendation applies with equal force to Mr. Jackson's competency to enter a guilty plea in this case should he reconsider.

assessment of competency for a defendant in federal criminal proceedings.  Section

4241 provides that the Court shall find the defendant to be incompetent:

> If, after the [competency] hearing, the court finds by a preponderance
> of the evidence that the defendant is presently suffering from a mental
> disease or defect rendering him mentally incompetent to the extent
> that he is unable to understand the nature and consequences of the
> proceedings against him or to assist properly in his defense . . . .

18 U.S.C. § 4241(a), (d).  "In other words, [the defendant] must have 'sufficient

present ability to consult with his lawyer with a reasonable degree of rational

understanding and a rational as well as factual understanding of the proceedings

against him,'" *Dixon,* 901 F.3d at 1341 (quoting *United States v. Cruz*, 805 F.2d

1464, 1479 (11th Cir. 1986) (cleaned up), and be able to "properly assist in [his]

own defense," *Drope v. Missouri*, 420 U.S. 162, at 171 (1975).  *See also United*

*States v. Cometa*, 966 F.3d 1285, 1291 (11th Cir. 2020) ("A defendant is competent

if he possesses the 'capacity to understand the nature and object of the proceedings

against him, to consult with counsel, and to assist in preparing his defense.'")

(cleaned up) (quoting *United States v. Wingo*, 789 F.3d 1226, 1235 (11th Cir.

2015)), *cert. denied*, 141 S. Ct. 1433 (2021); *Watts v. Singletary*, 87 F.3d 1282,

1286 (11th Cir. 1996) ("The competency inquiry then, is a functional one.  It

focuses on the criminal defendant's capacity to contribute sufficiently to his own

defense, to allow a fair trial, and ultimately, serves to protect both the defendant and society against erroneous convictions."). There is no burden shifting in the analysis,[16] as "a petitioner raising a substantive claim of incompetency is entitled to no presumption of incompetency and must demonstrate his or her incompetency by a preponderance of the evidence." *United States v. Bradley*, 644 F.3d 1213, 1268 (11th Cir. 2011); *see also United States v. Izquierdo*, 448 F.3d 1269, 1276-77 (11th Cir. 2006); *Battle v. United States*, 419 F.3d 1292, 1298 (11th Cir. 2005).[17]

---

[16] There is an open question about whether the defendant or the government bears the overall burden of proof, *see United States v. Cheney*, No. CR417-002, 2017 WL 3929321, at *1 (S.D. Ga. Aug. 21, 2017), *report and recommendation adopted*, 2017 WL 3928936 (S.D. Ga. Sept. 7, 2017), and *United States v. Young*, No. 3:16-CR-6-TCB-RGV, 2016 WL 6405842, at *2 (N.D. Ga. Sept. 21, 2016), *report and recommendation adopted*, 2016 WL 6277663 (N.D. Ga. Oct. 26, 2016), but that question need not be answered in this case, where the evidence is not in equipoise, "'that is, where the evidence that a defendant is competent is just as strong as the evidence that he is incompetent,'" *see Cooper*, 517 U.S. at 355 (quoting *Medina v. California*, 505 U.S. 437, 449 (1992)).

[17] Appellate courts review a trial court's finding that a defendant is competent to stand trial for clear error. *Izquierdo*, 448 F.3d at 1276. Such findings are clearly erroneous "only when we are left with a definite and firm conviction that a mistake has been committed." *Id.* at 1278 (quotation omitted). Significantly, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* (citation omitted).

## III.   DISCUSSION

As discussed above, the only evidence offered by the parties were the three reports, Dr. Kissin's CV, and her testimony.   The undersigned has carefully reviewed the reports and, though they reach different conclusions on the issue of competency, finds them all thorough and well-reasoned.   Though it is a close call, I am ultimately convinced by conclusions found the two more recent evaluations, opining that Mr. Jackson is competent to stand trial.   In particular, Drs. Kissin and Rodriguez made a strong case through their reports and Dr. Kissin's testimony that Mr. Jackson—more likely than not—has the ability to understand the nature of the of the proceedings against him, to consult rationally with his attorney, and to properly assist in his defense.   The two evaluations and reports are the most recent of the three and were supported by formal interviews as well as hours of informal interviews.   Dr. Kissin's evaluation, in particular, was bolstered by her CV, professional experience,[18] admission as an expert witness, and testimony; and her conclusions were defended against rigorous cross-examination by defense counsel.

---

[18] For instance, Dr. Kissin explained that she had completed hundreds of competency evaluations, and provided a detailed explanation for how she evaluates a subjects competency under § 4241.   (Tr. at 7-8; *see also* GX-1 (CV).)   Dr. Halverson's CV and resume were not offered into evidence, and the Court is unsure of his qualifications and experience.

Significantly too, Drs. Kissin's and Rodriguez's evaluations took place over several months in a BOP facility and with the added benefit of Dr. Halverson's report, making their observations and conclusions "far more comprehensive and extensive" than Dr. Halverson's. *United States v. Puerto*, 392 F. App'x 692, 711 (11th Cir. 2010). Indeed, Dr. Kissin was even privy to Mr. Jackson's courtroom outburst, which came in the middle of her testimony.

The only counter to their opinions is the report of defense counsel's retained expert finding that, as of August 2019, Mr. Jackson was not competent to stand trial. However, as discussed, Dr. Halverson's qualifications and testimony have not been offered into evidence; he was not certified as an expert witness; and he was not cross-examined regarding his methodology or conclusions. As a result, his report is entitled to less weight from the start. *See United States v. Cordell*, No. 4:09-CR-006-CAP-WEJ, 2011 WL 2581018, at *7 (N.D. Ga. May 23, 2011) (considering expert report over hearsay concerns when competency expert did not testify, but "giv[ing] it less weight than [the testifying expert]'s report), *report and recommendation adopted*, 2011 WL 2580864 (N.D. Ga. June 29, 2011). Moreover, his report is approaching two years old, which raises issues of staleness. *See, e.g., Lewis v. Zon*, 573 F. Supp. 2d 804, 822 (S.D.N.Y. 2008) (finding "critical flaw"

28

with competency report prepared a year prior).  Finally, the conclusions in the report were fairly ambivalent and even optimistic about Mr. Jackson's status—the incompetency determination was largely predicated on Mr. Jackson's inability to work with his attorney in August 2019, and Mr. Halverson opined that there was a "substantial probability" that Mr. Jackson could be restored to competency with some legal education and the fostering of his relationship with counsel.[19]  As such, the undersigned does not find Dr. Halverson's conclusions to preponderate over those of the other experts.

Were that not enough, Drs. Rodriguez and Kissin specifically undermined Dr. Halverson's bases for concluding that Mr. Jackson is incompetent.  Dr. Rodriguez reviewed Dr. Halverson's report as part of her evaluation, explicitly discussed his findings in her report, and explained that his opinions were not supported by objective tests.  In particular, she noted that (1) Dr. Halverson did not administer objective tests to assess Mr. Jackson's intellectual or psychological functioning; (2) in arriving at his diagnostic impressions, he relied on "an unknown test" from a psychological screening dated fifteen years earlier, "in which the

---

[19] Indeed, Dr. Halverson believed that he had made progress in educating Mr. Jackson during their short time together.

testing conditions, subtests administered, and validity indicators were also unknown," (3) he did not administer any tests of adaptive functioning; and (4) he "did not administer objective measures of response style to determine whether Mr. Jackson demonstrated a genuine or exaggerated pattern of responding" in assessing whether Mr. Jackson was malingering or otherwise exaggerating his symptoms. (Rodriguez Report at 7.)   Dr. Rodriguez also had significantly more time to evaluate Mr. Jackson; she based her findings on a 45-day observation and evaluation period, while Dr. Halverson met with Mr. Jackson for four hours on one day to prepare his report.   Further, Dr. Rodriguez was aware of and considered Jackson's violent and disruptive behavior at both USP-Atlanta and FDC-Miami and still reached the conclusion that Mr. Jackson is competent.  (*See id.* at 6-7.) Finally, Dr. Rodriguez observed Mr. Jackson more recently than Dr. Halverson, who had stated that Mr. Jackson could be restored "in the foreseeable future."

Much the same, Dr. Kissin discussed Dr. Halverson's report and explained that his conclusions were incorrect.  Dr. Kissin highlighted that (1) the records Dr. Halverson relied upon to formulate Mr. Jackson's intellectual functioning were essentially "non-identified measures," but in any event, likely represented functioning in the low-average range (but without any "significant cognitive

deficits"); (2) Dr. Halverson's PTSD and obsessive compulsive "discussion[s] d[id] not provide symptoms typically consistent with these disorders" or evidence that the symptoms "significantly impact his day-to-day functioning and behavior"; and (3) Mr. Jackson's self-narratives about his symptoms appeared to amount to malingering for "secondary gain." (GX-2 at 4, 7.) As with Dr. Rodriguez, Dr. Kissin had significantly more time to evaluate Mr. Jackson and observed Mr. Jackson even more recently than Dr. Halverson. Most significantly, Dr. Kissin explained why diagnoses of antisocial personality disorder and malingering do the best job of fully accounting for all of Mr. Jackson's symptoms, his history, and his ongoing behavior and presentation (including the Court's own observations). (*Id.* at 8.)

In his post-hearing brief, Mr. Jackson contends that Drs. Kissin and Rodriguez had no reliable basis to conclude that he has sufficient present ability to consult his lawyer with a reasonable degree of rational understanding. [Doc. 592 at 7-10.] Mr. Jackson points to the fact that Dr. Halverson found him incompetent based upon his inability (1) to consult adequately with counsel (finding that he "did not demonstrate an ability to discuss his case rationally") and (2) "adequately assist [] in his defense." (*See* DX-1 at 13.) Mr. Jackson implies that Dr. Halverson's

report created a presumption regarding those aspects of the competency analysis that must be rebutted by other expert testimony; and because Drs. Kissin and Rodriguez "did nothing" to assess these prongs—for example, by inquiring about Mr. Jackson's understanding of his case and the legal process, contacting his present or former counsel, or engaging him on his felt about his lawyer or his case—her opinion leaves that conclusion in Dr. Halverson's report as controlling. [*See* Doc. 592 at 7-10.]

The Court is skeptical of the suggestion that Dr. Halverson's report created—or even could create—any presumptions about Mr. Jackson's status. Regardless, Drs. Rodriguez and Kissin did in fact address the supportability of Dr. Halverson's opinion.  Dr. Rodriguez criticized Dr. Halverson's conclusions about Mr. Jackson's intellectual and adaptive functioning, as well as his rejection of malingering, for being based entirely upon "subjective opinions of [Mr. Jackson]'s perceived effort," (Rodriguez Report at 5); she described how those conclusions were undermined in myriad ways, including through Mr. Jackson's displays of "adequate attention and concentration skills when motivated to do so," and by his capable use of written and telephonic communications (*id.* at 7-8); she explained how malingering and antisocial personality disorder better explained Mr. Jackson's

symptoms and presentation (*id.* at 8-9); and she concluded that his "behavior appeared purposeful and under his volitional control" and that he could "assist in his own defense if motivated to do so" (*id.* at 10).  Dr. Rodriguez, then, very squarely addressed Dr. Halverson's conclusions and provided sufficient bases for her conclusion that Mr. Jackson could assist in his defense.  The Court is particularly struck by the report that Mr. Jackson had no difficulty engaging calmly and rationally in written and telephonic communications (outside of the direct view of Dr. Rodriguez), which the undersigned considers evidence that Mr. Jackson also has the capacity to communicate and disclose pertinent information to his attorney and to assist appropriately in his own defense.

Dr. Kissin similarly took up and rejected Dr. Halverson's conclusions. Reviewing his "overall history," Dr. Kissin found "no substantive, reliable information demonstrating Mr. Jackson suffers from severe mental illness . . . . (GX-2 at 7.)  Notably, she found that "no display of psychosis or thought disorder were evident at any time throughout the course of the instant evaluation period," (*id.*); she determined that he displayed cognitive functioning in the "low average range" based upon his ability to engage "in an insightful, reflective, and relatively sophisticated manner" when "willing to engage," (*id.*); she diagnosed him with

antisocial personality disorder as "most consistent with [his] history and ongoing presentation," (*id.* at 8); and she concluded that because his "maladaptive behaviors [are] . . . in his volitional control," he is able to "understand the nature and consequences of the proceedings against him or to assist properly in his defense," (*id.* at 9-10). Further, Dr. Kissin very credibly testified that, in relation to Mr. Jackson's ability to consult with counsel and assist in his defense, (1) he has "full capacity to engage in very rational conversations when he chooses to do so . . . general kinds of the engagement that one would have to utilize in the course of talking to one's attorney in terms of decision-making," and (2) that he "presented with no limits in his capacity to understand any other concept . . . and there is no reason that those skills would not be able to translate to his engagement with his attorney if he chose to do so." (Tr. at 37-38.)[20]  Dr. Kissin therefore directly took

---

[20] While Mr. Jackson also attacks Dr. Kissin for having failed to contact his prior attorneys [*see* Doc. 592 at 8], Dr. Halverson himself appears to have undertaken no better efforts to do so (*see generally* DX-1), and there is no record evidence that he spoke to anyone other than present counsel. As a result, Dr. Halverson's conclusions on the matter cannot be said to be better guided than Dr. Kissin's. Moreover, there is nothing to suggest that when Dr. Kissin solicited information from present counsel, he made any effort to connect her with prior counsel. (*See, e.g.*, Tr. at 44 ("So I did not speak to any of Mr. Jackson's attorney other than reaching out for information, as we typically do. . . . We get correspondence sometimes, we get calls sometimes. Attorneys certainly do sometimes feel like they might have something they want us [to] know, and that

up the aspects of the competency determination Mr. Jackson complains about, and

the Court is persuaded by her report and testimony.[21]

Mr. Jackson separately contends that Dr. Kissin utilized an improper

competency standard to reach her conclusion, and that her opinion should be

rejected as a result.  [Doc. 592 at 10-12.]  When Dr. Kissin was asked for the

standard that she utilized, she testified that it was "whether the individual presents

with mental defect or illness, and whether that defect of illness prevents them from

being able to participate with their attorney, whether they're able to make decisions

_____

certainly happens [] quite frequently.").)  If the information were as necessary and
non-duplicative as Mr. Jackson contends, the Court is at a loss for why counsel did
not make better efforts to ensure that all of the experts in this case had access to it.

[21] To the extent that Mr. Jackson's argument is meant to read that Dr. Kissin
could not, as a matter of law, form an opinion as to his ability to consult with
counsel and adequately assist in his defense because she did not formally and
specifically ask Mr. Jackson "how he and his lawyers got along," or "standard
competency questions" like the "role of the judge, the prosecutor, the defense
attorney, the jury, etc.," [see Doc. 592 at 9-10], the Court rejects Mr. Jackson's
argument.  Dr. Kissin reviewed his criminal history and court records; repeatedly
attempted (if unsuccessfully) to discuss his understanding of "courtroom
proceedings" and his "ability to establish and maintain a working relationship with
an attorney"; had informal conversations about his arrest and criminal history,
when he found out whether he was guilty or not guilty, and the present charges and
why he was in custody; and had the "general kinds of engagement" with Mr.
Jackson that "one would have to utilize in the course of talking to one's attorney."
(GX-2 at 9-10; Tr. at 23-24, 37-38, 51.)  Dr. Kissin also testified that her "lack of
answers to those [standard] questions," did not prevent her from reaching her
competency conclusions.  (Tr. at 50-52.)

in -- in their case -- and understand the charges against them," (Tr. at 18), which aligns with the standard set forth in 18 U.S.C. § 4241.  Because she did not explicitly use the constitutional standard set forth in *Dusky v. United States*, 362 U.S. 402 (1960) and *Drope*—in particular, explicitly answering (1) whether Mr. Jackson "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding," *Dusky*, 362 at 402, (2) "whether he has a rational understanding as well as factual understanding of the proceedings against him," *id.*, and (3) whether he can "properly assist in [his] own defense" *Drope*, 420 U.S. at 171, Mr. Jackson considers her opinion "fatally flawed."  [Doc. 592 at 11.]

Here's the rub.  Regardless of how Dr. Kissin formulated the competency standard in her report, she made clear during her testimony that she considered Mr. Jackson competent under all aspects of the *Dusky/Drope* standard as well. Responding specifically to defense counsel's concerns—that she had focused on whether Mr. Jackson presented with a major mental illness and not on his ability to consult counsel and assist in his defense—Dr. Kissin testified that regardless of any mental illness she had concluded that:

> [Mr. Jackson] has full capacity to engage in very rational conversations when he chooses to do so where he discusses concepts, where he discusses things from his memory, where he's able to use information to talk about things that have happened to him, talk about

the future -- so all, you know, general kinds of the engagement that one would have to utilize in the course of talking to one's attorney in terms of decision-making.

…

[He also] presented with no limits in his capacity to understand any other concept, any other type of interaction, be able to engage appropriately, again, when he chose to do so in the course of, you know, the lengthy amount of time that he was here, and there is no reason that those skills would not be able to translate to his engagement with his attorney if he chose to do so.

(Tr. at 36-38; *see also id.* at 53 ("Q:  And, again, to Mr. Ertel's points, are you confident that your evaluation met those standards set forth in the Supreme Court in the *Dusky* case?  A:  I am.").)  As a result, it is clear that Dr. Kissin's conclusions address the competency standard set forth in *Dusky* and *Drope*,[22] and Mr. Jackson cannot be heard to complain otherwise.

———————————

[22] As did Dr. Rodriguez, when she opined:

While the true extent of his legal knowledge and abilities was difficult to determine given his lack of cooperation, the defendant demonstrated no symptoms of an active mental illness that would interfere with his rational understanding of the proceedings or his ability to assist toward his defense.  Throughout the evaluation, the defendant's behavior appeared purposeful and under his volitional control.  He appears to have no impairment that would prohibit an understanding of the legal process and ability to assist in his own defense if motivated to do so.

37

To be sure, Mr. Jackson appears to suffer from mental problems, and the episodes of disruptive and violent conduct at USP-Atlanta, FDC-Miami, and FMC-Devens are troubling, as was his outburst during the competency hearing. But Drs. Kissin and Rodriguez considered and accounted for this in their reports (and Dr. Kissin was present for his outburst[23]); further, both reviewed Dr. Halverson's report and had access to a more longitudinal picture of how any impairments impact his day-to-day functioning. For these reasons, even acknowledging that Dr. Halverson reached a contrary opinion in 2019, the undersigned finds Drs. Kissin and Rodriguez's conclusions more compelling. *See United States v. Salery*, 681 F. App'x 854, 857 (11th Cir. 2017) (holding that district court did not err in finding defendant competent to stand trial where the court "was faced with conflicting opinions and evaluations from two experts, and chose to credit [the expert who] . . .

---

(Rodriguez Report at 10.)

[23] The Court has a conflicted view on the nature and significance of Mr. Jackson's outburst during the competency hearing. It was certainly very concerning, but the undersigned ultimately finds Mr. Jackson's comportment and behavior during the outburst to have been somewhat inauthentic and exaggerated, suggesting malingering or manipulation. As a result, the Court's own observations do not weigh in favor of finding Mr. Jackson incompetent.

evaluated [defendant] for a longer period of time and with more comprehensive testing").

The Court also understands that because Mr. Jackson's impairments not only include malingering but also appear to predispose him towards acting out for secondary gain, he may not be inclined to work collaboratively with counsel, and indeed, presents a uniquely challenging scenario for defense counsel. But Mr. Jackson's challenging disposition does make him incompetent. The Eleventh Circuit's decision in *Battle v. United States*, provides guidance on this point.[24] In *Battle*, experts for both the prosecution and the defense examined the defendant to determine whether he was competent to stand trial. *See Battle*, 419 F.3d at 1295. Mr. Battle consistently reported to the evaluators that he "felt 'pain and sensations' due to microchip implants that had been put inside his body by prison staff to monitor and control him." *Id.* at 1296. The defense experts all agreed that he was incompetent to stand trial due to paranoid schizophrenia, while the government's experts disagreed about his competency. *Id.* Despite the conflicting opinions, the

---

[24] The Court pauses to note that *Battle* is a decision on a petition for a writ of habeas corpus under 28 U.S.C. § 2255, rather than a direct appeal; however, the court's reasoning is persuasive here, addressing key aspects of the competency evaluation.

magistrate judge found him competent to stand trial, and the district judge agreed. *Id.*

Mr. Battle, like Mr. Jackson here, was extremely difficult to work with. Just before opening statements, he told the district judge that he disagreed with his attorneys and the evidence they planned to present, explaining that he wanted them to present "more credible evidence." *Battle*, 419 F.3d at 1297. He also complained that he felt pains and sensations and that it was difficult for him to focus. *Id.* After the trial began, Mr. Battle exhibited more disruptive behavior, "speaking out in front of the jury to correct or agree with witnesses"; rocking "back and forth" in his chair; and expressing frequent unhappiness with his lawyers because they would not present a defense centered on his imagined implants. *Id.* Over his attorneys' objections, Mr. Battle even testified as the first defense witness, admitted to the murder for which he had been charged, acknowledged it was wrong to kill, and telling the jury about his purported implants. *Id.*

Despite all of this, the Eleventh Circuit still found no clear error in the trial court's competency decision, explaining that "a district court does not clearly err simply by crediting one opinion over another where other record evidence exists to support the conclusion." *Battle*, 419 F.3d at 1299 (citing *Johnston v. Singletary*,

162 F.3d 630, 639 (11th Cir. 1998)). Importantly for present purposes, Mr. Battle's antagonism with his attorneys, including his frustration with their refusal to find his implants and to present an "implant defense,"[25] did not demonstrate that he was incompetent, because, according to the Eleventh Circuit, a defendant's exhibition of "an antagonistic relationship with his lawyers over their representation of him is no indicator of incompetency. Many criminal defendants differ with their lawyers on how best to represent them." *Id.*

In Mr. Jackson's case, the experts' views on his competence are opposed, but the Court finds more credit in Drs. Kissin and Rodriguez's conclusion that he is competent for all the reasons set forth above. The potential problems that defense counsel will have to navigate in educating Mr. Jackson about his case and the proceedings, not to mention managing him at trial, are undoubtedly very serious and will require a careful, guiding hand, but they are insufficient to render him incompetent. Given the testimony and documentary evidence received at the hearing, as well as the Court's own observations, a preponderance of the evidence shows that Mr. Jackson has the present ability to understand the nature and

---

[25] The Circuit also considered his "courtroom outbursts, odd behavior, his history of mental illness," and concluded that even in combination, the facts did not mandate a finding of incompetence. *Battle*, 419 F.3d at 1299.

consequences of the proceedings against him, to consult with his lawyer with a reasonable degree of understanding, and to assist properly in his defense.

## IV.   CONCLUSION

In conclusion, it is **RECOMMENDED** that Mr. Jackson be found competent to stand trial, as he is presently able to understand the nature and consequences of the proceedings against him, to consult with his lawyer with a reasonable degree of understanding, and to assist properly in his defense.

There are no other matters pending before the undersigned relating to this defendant.  Accordingly, this case is **CERTIFIED READY FOR TRIAL**.

IT IS SO RECOMMENDED this 25th day of May, 2021.

JOHN K. LARKINS III
United States Magistrate Judge

42